In re Application for the Disbarment of the Honorable Jack F. C. GILLARD, an Attorney at Law of the State of Minnesota

**and**

Complaint Concerning the Honorable Jack F. C. Gillard, Judge of the District Court for the Third Judicial District Before the Minnesota Board on Judicial Standards.

No. 47309.

Supreme Court of Minnesota.

June 30, 1978.

Opinion Aug. 4, 1978.

Rehearing Denied Sept. 6, 1978.

See also, 260 N.W.2d 562.

Sachs, Latz & Kirshbaum, Minneapolis, for Board on Judicial Standards.

R. Walter Bachman, Jr., Admin. Dir. on Prof. Conduct, St. Paul, for Lawyers Prof. Resp. Board.

Thomson, Nordby & Peterson, Jack S. Nordby, St. Paul, for respondent.

## ORDER DISBARRING ATTORNEY

The above entitled matter came on for hearing before the court sitting en banc on June 28, 1978, for review of the petition filed by the Administrative Director of the Lawyers Professional Responsibility Board

seeking the disbarment of respondent. In an opinion rendered on September 16, 1977, this Court found the referee's findings and conclusions to be amply supported by the evidence but stayed the disbarment proceedings until the Board on Judicial Standards, to whom the case was referred to permit respondent to be heard on the question of his fitness to retain judicial office, made its own findings and recommendation to the Court.

WHEREAS the Board on Judicial Standards has afforded respondent due process regarding his fitness to retain judicial office, and

WHEREAS respondent's serious acts of misconduct make him unfit to practice law in the State of Minnesota; now, therefore,

IT IS ORDERED that respondent, Jack F. C. Gillard, be disbarred. Opinion will follow.

## ORDER REMOVING JUDGE

The above entitled matter came on for hearing before the court sitting en banc on June 28, 1978, on the recommendation of the Board on Judicial Standards for the removal of The Honorable Jack F. C. Gillard, Judge of the District Court for the Third Judicial District.

WHEREAS it appears to the Court, upon a thorough review of the findings and conclusions and recommendation for removal filed by the Board on Judicial Standards, the Petition to reject the Recommendation of the Commission filed by respondent, the briefs filed by the parties, and the oral arguments made to the Court, that respondent engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute, now, therefore,

IT IS ORDERED that respondent, Jack F. C. Gillard, be removed from his position as Judge of the District Court for the Third Judicial District. Opinion will follow.

Heard and considered by the court en banc.

PER CURIAM.

We review the findings, conclusions, and recommendations of removal and disbarment filed by the Board on Judicial Standards (Judicial Board) and the Lawyers Professional Responsibility Board (LPRB), based upon incidents of preappointment professional misconduct by respondent, District Judge Jack F. C. Gillard.

Upon thorough examination of the record and careful consideration of the arguments and explanations offered, we have concluded that the allegations of grave professional misconduct are substantiated by the evidence and warrant imposition of the extreme sanctions recommended. We therefore directed respondent's removal and disbarment by orders of June 30, 1978.

The suggestion that Gillard may have been guilty of professional misconduct was first made in early 1976, based upon disclosures and allegations made in the course of a criminal investigation of Jerry LaFavre, an Albert Lea resident suspected of insurance and securities fraud. Subsequent investigations by the county attorney's office and the LPRB disclosed other complaints of misconduct, warranting a hearing before the LPRB.

On October 27, 1976, we denied Gillard's petition for a writ prohibiting further proceedings before the LPRB, and on or about November 8, 1976, the Petition for Disbarment was filed. We appointed Retired District Judge Rolf Fosseen as referee, by order of December 14, 1976, and evidentiary hearings were held before the referee from April 11 through May 2, 1977. Eighteen complaints were originally in issues; during the course of the proceedings three complaints (6, 7, 8) were dismissed with prejudice on motion of the LPRB, two more (16 and 17) were dismissed by the referee as not sustained by the evidence. Referee Fosseen filed his recommendation for disbarment with this court on July 6, 1977.

We then considered the evidence relating to fifteen complaints of professional mis-

conduct.[1] So far as now pertinent, Judge Fosseen found:

*"COMPLAINT NO. I.*

Re: Financial Security Life Insurance Co.

"1. On October 3, 1974, W. Kenneth Irwin, President of Financial Security Life Insurance Company of Moline, Illinois, telephonically contacted respondent in Albert Lea, Minnesota. Mr. Irwin after introducing himself told respondent that he had been recommended by Jerry LaFavre, an agent of their company, as an attorney who could help his company gain admission in Minnesota. Respondent agreed to represent the company. The telephone conversation was confirmed by Mr. Irwin's letter to respondent dated October 3, 1974 * * * which contained nominal financial information regarding the company.

"2. During the telephone conversation aforementioned, Mr. Irwin stated to respondent that he 'wants someone who is friendly with the insurance department—someone who knows his way around' * * *. Respondent testified his interpretation of Mr. Irwin's comment was, 'Someone who knew how to make an insurance application—someone other than me.' Respondent first testified that the word 'friend' didn't cause him to think of John Morrison, but admitted that on July 13, 1976, in a statement, he said:

'Mr. Irwin did make the statement to me that he wanted to have someone; that is, I've got the word friend in the insurance department that knows their way around. And of course this is what made me think of Mr. Morrison, because I knew he had had this business with that mutual company. And that if anybody knew a law firm, I assume he has a law firm in Minneapolis, that does his work, that they would know how to do it.' * * *

"3. Following several telephone conversations between Mr. Irwin and respondent,

and several telephone conversations between respondent and John Morrison, respondent in late November or early December, 1974, set up a meeting of the three in Morrison's offices on the morning of January 9, 1975, at Wayzata, Minnesota. Respondent testified he told Mr. Morrison that he had a client who wanted to qualify his company in general insurance in Minnesota, and that he would like a conference with him and his client for some advice. Although it appears that respondent and Morrison had at least two telephone discussions relative to the matter, respondent testified that neither he nor Mr. Morrison mentioned lawyers, law firms, expenses or fees. Respondent further testified that the 'idea of the meeting' was to get some idea about a law firm to contact, and to get some appreciation of the problems, because, he said, he knew nothing about making such an application as was being sought. Respondent acknowledged that other than contacting Mr. Morrison he had done no work on the matter, and that he had no idea as to the attorney's fees and expenses which might be involved.

"4. Shortly before noon on January 8, 1975, Mr. Irwin telephoned respondent in Albert Lea, with the specific intent of arriving at a mutually acceptable firm-fee for his services. Mr. Irwin proposed the gross fee of $3,000 which he told respondent had been approved by the executive committee of the company, and added: 'And if his services required less time than this particular fee, that we felt that was all right. If it required more time, that was his problem'. * * * Respondent replied that $3,000 was not enough and that it would require approximately $15,000. When asked why such a high fee, respondent replied that 'there were a lot of people that had to be taken care of.' * * * Mr. Irwin then told respondent that he would have a meeting with his group and would be in touch with him.

---

1. Although complaints Nos. 16 and 17 were dismissed by the referee, those charges were properly before this court in the exercise of our de novo review. *In re McDonald*, 204 Minn. 61, 282 N.W. 677 (1938); *In re Tracy*, 197 Minn. 35, 267 N.W. 142 (1936); *In re Forbes*, 192 Minn. 544, 257 N.W. 329 (1934).

"5. Upon concluding the telephone conversation, Mr. Irwin immediately telephoned the company's general counsel, Mr. Clarence Christiansen, requesting he drop everything and come to the company's office. Mr. Christiansen testified that he was informed by Mr. Irwin that he felt 'something was being asked under the table.' * * * Some twenty minutes later, Mr. Irwin and Mr. Christiansen jointly placed a phone call to respondent. After an over-the-phone introduction of Mr. Christiansen, he asked respondent what the $15,000 fee was going to be used for. Mr. Christiansen testified that respondent did not give him any direct answer. Mr. Christiansen then asked whether the $15,000 fee included his fee for services, to which respondent replied that it did not, and that his fee would be $1,000 to $1,500 in addition to the $15,000. The most specific answer Mr. Christiansen was able to get from respondent was that the $15,000 would be used for 'expenses'.

"6. During the hearing, respondent testified that the $15,000 fee was necessary to pay 'lawyers, auditors, certified public accountants and actuaries.' He also testified that he wanted to make the fee high enough so that there wouldn't be any loss on it. However, respondent admitted that at no time did he itemize expenses to Mr. Irwin or to Mr. Christiansen; that at no time did he state to either that he would be engaging any of the persons aforementioned; and that at no time did he contact any such persons.

"7. Mr. Christiansen under date of January 10, 1975, wrote to respondent (Petitioner's Exhibit GGGG) as follows:

'Mr. Jack Gillard
Attorney at Law
216 East Main
Post Office Box 947
Albert Lea, Minnesota 56007

Dear Mr. Gillard:

Since our telephone conversation of earlier this week in which Mr. Irwin and I talked to you, we have reviewed with members of the executive committee of the company your proposal for assistance in qualifying our company in the State of Minnesota.

You had indicated that your fee would be in the neighborhood of $16,000.00 and that the reason for this was the necessity to make payments to other people in order to accomplish this qualification. The members of the executive committee were in accord with my recommendation; namely, that we have never been involved in paying other than ordinary attorneys fees for obtaining any rights granted by the laws of any state and that now is not the time to commence.

Under the circumstances, if you have any charges for work already performed, will you please present your statement for services rendered.

I regret that we are unable to complete this matter in the usual legal form.

Respectfully yours,

Clarence H. Christiansen
General Counsel

CHC/ee

cc: W. Kenneth Irwin, President
    Jerry LaFavre'

Respondent admitted that he received the letter shortly after its date, admitted that he made no response thereto, and admitted he did not send a statement for services. In justification for not responding, respondent testified: 'I'm not sure whether I read it over that day or not. I know that I didn't pay much attention to it, laid it aside.' * * * When asked if he sent a bill for legal services, he answered: 'No sir, I hadn't done anything.' * * *

"8. About May 24, 1976, a copy of Mr. Christiansen's letter of January 10, 1975, * * * was forwarded by the Minnesota State Insurance Division to the Freeborn County Attorney and to the Lawyers Professional Responsibility Board. Mr. Bob Goldman, the then county attorney, immediately upon receiving said letter-copy phoned respondent and followed-up that day with a personal call at the latter's chambers, where the two discussed the circumstances relating to said Exhibit GGGG. Mr. Goldman testified he told respondent that it looked like he would have to bring some criminal charges against Jerry La-

Favre, and, from the information he had, he was concerned that his (respondent's) name would be brought into the matter. On direct examination, Mr. Goldman was asked whether he recalled any conversations with respondent with respect to either Mr. John Morrison or Mr. M. T. Morrison. Mr. Goldman said he recalled that the names were 'discussed', but could not recall in what connection. He also said he recalled that respondent had indicated to him that he and one of the Morrisons had a conversation which involved the sum of $15,000, and that in his notes of the conversation he had the word 'fee' in quotation marks　＊　＊　＊. However, Mr. Goldman testified that he could not then say what the word fee in quotes signified.

"9. It was brought out while petitioner was attempting to impeach Mr. Goldman, that he had in July of 1975 stated in an unsworn but recorded statement to petitioner that respondent had informed him that M. T. Morrison, father of John Morrison, had been involved in setting the $15,000 fee. However, at the time of this hearing, Mr. Goldman said he no longer had an independent recollection of respondent's statement of Mr. M. T. Morrison's involvement. When confronted with a transcript of his prior statements, Mr. Goldman acknowledged the accuracy of the stenographic transcript of his prior statement, but held fast to his claim that his recollection was not refreshed thereby. In view of Mr. Goldman's loss of memory, his prior statements can only serve to impeach his credibility, and may not be used to prove the truth of such prior statements as against respondent.

"10. Respondent did not specifically state to either Mr. Irwin or Mr. Christiansen that he had an influence with any tribunal, legislative body or public official, or that he would be able to influence improperly any such person or body. But each of the persons knew that the respondent was employed because it was believed by Mr. Irwin that respondent had connections with politically influential people who might establish a more favorable climate than encountered by the company on its previous application at qualifying. However, when respondent asked for the $15,000 fee plus an additional $1,000 to $1,500 for his services, Messrs. Irwin and Christiansen hastily terminated respondent's employment.

"11. The ultimate fact conclusion drawn from the foregoing tributary facts is that respondent inferred and implied to Mr. Irwin and Mr. Christiansen that the $15,000 fee was necessary to influence certain unnamed persons to improperly influence the granting of a license by a public agency.

## "COMPLAINT NO. II.

Re: Jerry LaFavre

"1. Jerry LaFavre and Gene Lageson, insurance salesmen, met with respondent in late 1974. LaFavre explained to respondent that their agency was selling insurance-funded tax shelter plans to farmers. Mr. LaFavre told respondent he wanted to refer his prospects to him for a free initial legal consultation regarding estate planning and will drafting. LaFavre told respondent that for such services he could bill his company, Interstate Marketing. Respondent, upon agreeing to the proposal, was told by LaFavre that his office would set up the appointments for his customers with respondent's office, which was done.

"2. Respondent knew that LaFavre was offering legal services to his customers as a part of a 'package plan' for farmers and others, in which, in addition to receiving an annuity or insurance policy, they would receive certain other services such as accounting, preparation of tax returns, and investment planning. Respondent also knew that in the course of his offering free legal services as an inducement to prospective insurance customers, Mr. LaFavre was referring said customers to him by name. Respondent knew that LaFavre was actively soliciting customers and that such customers were being offered respondent's legal services free of charge as an inducement to purchase LaFavre's goods, services, contracts and policies.

"3. From about December of 1974 through May of 1975, Mr. LaFavre referred

some six to twelve of his prospects to respondent whom he consulted, advised and rendered legal services. In most instances the services consisted of an estate planning consultation, a drafting of a will, and professional assistance in executing a will. In all instances, the person to whom respondent rendered his services knew there would be no charge.

"4. During the aforementioned period, respondent at no time inquired of Mr. LaFavre or of Mr. Lageson regarding their sales pitch, promotion literature, advertising, or other features of their package plan which included his (respondent's) legal services. Nor did respondent disclose to these clients referred by LaFavre and Lageson that there existed a potential conflict of interest on his (respondent's) part by being compensated by his client, Mr. LaFavre.

"5. During the first part of 1975, respondent sent Mr. LaFavre a statement for legal services with respect to said referrals in an amount in excess of $200. Respondent received no money, but did receive from Mr. LaFavre certain merchandise, the value of which appears to have been set-off against said statement.

"6. There was no evidence reflecting that any of the persons referred to respondent ever purchased any services of LaFavre, or that any suffered any legal or financial detriment as a result of a referral.

## "COMPLAINT NO. III.

Re: Carlie Kroeger

"1. In January of 1973, Mr. Carlie Kroeger employed respondent to handle his action for personal injuries sustained in a two-car collision which occurred on January 9, 1973, between his host-driver, Scott Reese, and the other driver, Michael Ramirez. At the time respondent accepted the employment, he well knew Michael Ramirez was the half-brother of Marina E. Geri, his secretary for many years, but failed to disclose that fact to Mr. Kroeger.

"2. On October 10, 1973, a deposition of Mr. Kroeger was scheduled by adverse counsel. However, respondent neglected to so inform Kroeger, and when adverse counsel appeared they were told that Mr. Kroeger was 'unavailable', implying his absence was his client's fault.

"3. At the May 29, 1974, deposition of Mr. Ramirez, respondent learned that at the time of the accident Ramirez was on an errand for Quick-Stop Drive-In (a fast-food establishment) in Albert Lea. Notwithstanding that respondent in June of 1974 had informed his client and adverse counsel of his intention to make a claim against Quick-Stop, respondent did absolutely nothing to investigate, to negotiate, or to bring Quick-Stop in as a party defendant until a day or two before the 'day certain' trial date of December 9, 1974.

"4. It was not until November, 1974, that respondent first contacted the insurance carrier for Quick-Stop Drive-In. The insurance company was unwilling to discuss settlement until its investigation had been completed. Respondent, in the meantime, had heard from counsel for the two defendant drivers that their best combined offer of settlement was $6,000. Respondent on about November 21, 1974, led defendants' attorneys to believe that the $6,000 offer would be accepted, but that he would attempt to obtain an additional sum from Quick-Stop's carrier. Respondent thereupon arranged a postponement of the December 9, 1974 trial, and falsely told Mr. Kroeger the postponement was due to a request of Mr. Ramirez's attorney. The fact was that respondent, having agreed to defendants' offer of settlement and not having brought Quick-Stop in as a defendant, was not prepared to go to trial. Respondent represented to Judge Foley that if the case were to be continued, it would in all probability be settled. Judge Foley thereupon marked the case 'settled'. Following postponement of the trial, respondent failed to proceed expeditiously as against Quick-Stop Drive-In.

"5. Early in 1975 Mr. Kroeger, feeling that respondent had put him off, checked the district court records and learned the case had been marked 'settled' at the request of respondent. When confronted

with this information, respondent first said to Kroeger that 'there must be some mistake.' At a follow-up conference, respondent told Mr. Kroeger that he could place the matter back on the calendar for trial at any time he wished. Although the latter statement was not untrue, respondent was not candid and forthright in his representations; and did not tell all the facts surrounding the trial continuance.

"6. In June of 1975, respondent falsely informed Mr. Kroeger that he was actively negotiating with the attorneys for the defendants and with representatives of the insurance company for Quick-Stop, and that such negotiations were ranging between $8,000 and $9,500 in total. The fact was that respondent had not communicated with any such persons during June of 1975. Further, respondent had already agreed with defendants' counsel to settle the case for $6,000, but had not disclosed that fact to Mr. Kroeger.

"7. Under date of June 14, 1975 (Petitioner's Exhibit WWW), Mr. Kroeger wrote Mr. Roger Catherwood, Chairman of the District Ethics Committee, lodging a detailed complaint against respondent for repeatedly setting dates on which he expected to reach settlements which never materialized, and stated: 'I've been very unhappy with the service and treatment that I have received from Mr. Gillard.' Mr. Kroeger predicated his complaint not only on the long and frequent delays and put-offs by respondent, but also upon respondent's misrepresentations and inconsistent statements of facts. Mr. Kroeger had the feeling that respondent was stalling and always blaming the other side.

"8. Respondent by letter dated June 22, 1975, * * * responded to Mr. Roger Catherwood's letter of June 17, 1975, therein stated in part:
'* * * Earlier this month, I was in contact with the attorneys for the insurance carriers involved and with the claims manager for the third carrier. I advised Mr. Kroeger that I thought we might get an offer in the neighborhood of $8,000 to $9,500, and if such an offer was forthcoming, he should consider it.'

Said statement was false as aforementioned. The record is uncontroverted that respondent had no conversations with Quick-Stop's carrier between the months of April and July of 1975.

"9. In July of 1975 respondent was repeating the foregoing representation to his client. The fact was that he (respondent) was demanding only a $1,500 settlement from Quick-Stop's carrier, in addition to the $6,000 previously agreed upon between him and defendants' counsel.

"10. The Kroeger lawsuit against Mr. Ramirez and Mr. Reese was finally settled on September 18, 1975, for $6,000, and the claim against Quick-Stop was disposed of on October 13, 1975, for $750. Respondent waived his fee for services except for $250 costs.

"11. The claimed conflict of interest concerning Quick-Stop Drive-In was not sustained by the evidence and is found to be not true.

"COMPLAINT NO. IV.

Re: Albert and Mary Trettel

(A) Property Damage Case

"1. In January of 1973, Mr. and Mrs. Albert Trettel consulted respondent with respect to a two-car collision which occurred on December 24, 1972, between the vehicle owned and operated by Miss Marcella Trutwin of Morrison County, Minnesota, and the Trettel vehicle operated by their son, Edward, then 21 years, in which their other son, Gregory, then 18 years, was a passenger. Respondent agreed to make a claim for the damage to their automobile and to handle the claims of their sons for personal injury. Respondent thereafter met separately with Edward and received information relative to his injuries which respondent noted in his file * * *. Respondent informed the Trettels that he would go ahead and start working on the claims.

"2. Late February 1973, respondent represented to the Trettels that the automobile damage case would be coming up for trial that Fall and that he would file suit imme-

diately. In the meantime, and before September 1973, respondent informed the Trettels that he was negotiating with the attorney for Miss Trutwin, and assured Mr. Trettel several times that the case would be coming on for trial in August or September in the District Court in Little Falls, Minnesota.

"3. On October 1, 1973, ten months after receiving the matter, respondent caused to be served on Miss Trutwin a summons and complaint venued in Freeborn County, not Morrison County. Adverse counsel promptly answered and requested estimates of car damage. Although respondent had two estimates in his file, he ignored the request for six months. Also received with the answer were interrogatories which respondent completely ignored. During the 14 months which he handled the matter, respondent made no attempt to resolve the case except to write one letter * * *, and draft and serve said summons and complaint.

"4. On about April 26, 1974, Mr. Trettel, dissatisfied with the lack of progress by and the lack of information from respondent, proceeded to check out respondent's repeated assertions that he was merely waiting to hear from the Morrison County Clerk of District Court in Little Falls, Minnesota, as to the date of trial. On said last date, Mr. Trettel wrote said clerk, and in answer thereto said clerk informed Mr. Trettel that no action concerning the matter had been filed in his office. A few days following the receipt of said letter, one of the Trettels contacted respondent and, without mentioning the checking in Little Falls, inquired about the case. Respondent thereupon related that he had written the clerk in Little Falls to obtain a date for trial and that it would be tried in three to four weeks. The fact was that, though the summons and complaint had been served on October 1, 1973, the case had not been filed in any court.

"5. Mr. Trettel testified without contradiction that respondent failed to return any of his six or more telephone calls he made to secure information.

"6. Respondent was discharged by the Trettels in all matters in the latter part of April, 1974.

### (B) Medical Bills

"1. In December of 1973, Mrs. Trettel delivered to respondent medical bills incurred by her husband on behalf of their son, Gregory, totaling $997 (Petitioner's Exhibits II and JJ), and requested respondent seek payment from their insurance company under the medical-payment provision of the policy. Notwithstanding that respondent was given the name and address of the appropriate insurance agent to contact and was repeatedly requested to pursue the matter, he took no action whatsoever and falsely represented that he had made numerous efforts to collect. Respondent informed the Trettels that he had written first one and then another and then a third and then a fourth letter to the insurance company, but had received no response. Then respondent represented that he would give an ultimatum to the insurance company to the effect that he would write the insurance commissioner if they did not answer within ten days. Later, respondent told the Trettels that he had written the insurance commissioner to complain about their insurance company, but had received no response. The Trettels, suspicious, on April 30, 1974 wrote their company (Petitioner's Exhibit KK), and later the insurance commissioner, each promptly replying 'no record'. At this juncture (May 3, 1974), the Trettels lodged a complaint with the District Ethics Committee * * *. All said statements of respondent were false, and he admitted at the hearing that he hadn't sent a letter at any time to anyone concerning the medical bills.

"2. Respondent falsely denied orally to Mr. Catherwood ever informing the Trettels that he would or had written letters to their insurance company or the insurance commissioner.

"3. Respondent testified at the hearing that he gave the original medical bills to one Cliff Peterson, an insurance agent in Albert Lea, by leaving them on his desk.

Mr. Peterson testified that he never received the bills, and Robert Tuveson, Esq., produced the original bills and testified they had been delivered to him by respondent. The insurance company representatives testified that their records did not reflect any correspondence from respondent, and that the first notice of claim came in May of 1974 from Mr. Tuveson. The undersigned finds the representations of respondent are not true as to his leaving the said bills with Mr. Peterson.

### (C) Personal Injury Case

"1. It was clearly understood at the initial meeting with respondent that, in addition to the car damage case, he was to handle the personal injury cases for the Trettels' two sons. Subsequently, he did consult with Edward and did make notes thereof * * *. However, in his letter to Mr. Catherwood the respondent falsely stated that: 'At no time was there any conversation regarding a claim to be made through my office for the personal injuries to either one of the sons.' * * *

"2. The foregoing was submitted in evidence to reflect misrepresentations by respondent to the District Ethics Committee. No claim was made that there was any dereliction of duty by respondent in not proceeding with the personal injury actions.

### "COMPLAINT NO. V.

Re: Elmer J. Bowen

"1. In 1971 respondent drafted a will for Willie T. Bartness, who therein designated as executor his son-in-law, Elmer J. Bowen. Willie T. Bartness died on June 18, 1972, whereupon respondent without any contact with Mr. Bowen, and completely on his own initiative, proceeded to prove up said will and take over the administration of the estate as attorney for the executor. At the initial hearing on July 31, 1972, said will was admitted to probate, and Mr. Bowen was appointed and qualified as executor.

"2. Shortly thereafter, Mr. Bowen orally informed respondent that he desired to retain his regular attorney, Ralph Peterson, of Austin. Respondent angrily and stubbornly resisted the request and refused to turn over to Mr. Bowen or his attorney the estate papers. On August 10, 1972, Mr. Bowen and all persons interested in the estate mailed by certified letter to respondent a request that all papers of the estate be turned over to Mr. Bowen as executor, and then generously suggested that respondent submit an itemized statement for his services * * *. Respondent made no response to said letter.

"3. On August 28, 1972, Mr. Bowen again wrote respondent, requesting a reply within five days (Petitioner's Exhibit BBBB). Respondent continued to make no response.

"4. Mr. Bowen thereupon and by letter dated September 9, 1972 * * *, lodged a complaint against respondent with the District Ethics Committee Chairman, Mr. Roger Catherwood. By letter dated September 15, 1972, Mr. Catherwood advised respondent of the complaint. Respondent delayed replying until October 16, 1972, when he wrote Mr. Catherwood stating in part:

'I am advising Mr. Bowen to come in and retrieve his file upon payment of my bill.'

However, respondent did not so advise Mr. Bowen, nor did he submit a bill. On November 22, 1972, Mr. Catherwood again wrote respondent. On December 6, 1972, Mr. Bowen received a copy of a bill for respondent's services, which he promptly paid. Shortly thereafter, but almost four months after the original request, said estate papers were relinquished to Mr. Bowen's attorney.

### "COMPLAINT NO. IX.

Re: Austin-St. Paul Mutual Insurance Company

"1. The Austin-St. Paul Mutual Insurance Company (hereafter 'insurance company') by letter dated June 16, 1965, forwarded two small subrogation matters to respondent. One was a claim for $115.95 against a Mr. H. L. Herrin, and the other against Pelham Produce Carrier in the sum of $247. The letter of referral enclosed the necessary

documents to commence litigation. Respondent replied by his letter of June 18, 1965, stating that he would handle the matters and 'will keep you advised of all further developments.'

"2. On December 16, 1965, the insurance company wrote respondent inquiring as to the status of the two matters. Respondent made no answer. The next available correspondence is the letter of Peter Castor of the insurance company to respondent dated March 28, 1969, which refers to three earlier items of correspondence and asks respondent to give an immediate report as to the status of the two matters. Respondent again failed to respond. Mr. Castor again wrote respondent under date of July 23, 1969, asking for responses to his previous letters and threatening a bar association inquiry. Respondent again failed to answer.

"3. On August 29, 1969, Mr. Castor wrote to Mr. Gerald A. Regnier of the Minnesota State Bar Association, complaining about respondent's failure to answer correspondence since January 10, 1968. Mr. Regnier answered by letter dated September 9, 1969, with copy thereof to respondent, stating that he had talked with respondent by phone and that respondent had stated that 'he would handle the matter directly.'

"4. On October 16, 1969, Mr. Castor again wrote Mr. Regnier, stating:

'We have not as yet heard anything from Mr. Gillard regarding the progress of our files.'

and asked of Mr. Regnier that the Bar Association take further action. A copy of this letter, with a handwritten note thereon by Mr. Regnier to respondent, was forwarded to him shortly after October 17, 1969. Said note read: 'Would appreciate direction from you on proper disposition of this, by return mail. Thank you.' Respondent made no response to Mr. Regnier, nor did he communicate with Mr. Castor.

"5. On December 4, 1969, Mr. Roger Catherwood, as Chairman of the District Ethics Committee, wrote to respondent, summarizing the history of the matters as reflected in his files, and therein asking

respondent to 'report in detail to the insurance company, sending me a copy of the letter and also write me explaining the apparent delay.' Respondent completely ignored the letter and made no response to either Mr. Catherwood or the insurance company.

"6. Mr. Catherwood wrote respondent again on January 15, 1970, concerning these matters, stating he had received no response to his letter of December 4, 1969, and renewed his request that respondent write the insurance company and explain the delay. Respondent under date of January 23, 1970, wrote his first letter to anyone concerning the status of said matters since June of 1965. Respondent wrote one letter to Mr. Catherwood acknowledging his neglect of the matters and pointing out certain personal and health problems with which he had been faced. Another letter was written to Mr. Castor informing him that the Pelham claim had been placed in suit (1–20–70), and further stating:

'On February 10, 1970, I will give you a further status report of these claims.'

Not receiving said promised report, Mr. Castor on February 10, 1970, wrote respondent asking him to give an approximate estimate as to when the matter would come up for trial so that he could diary their file and eliminate correspondence until that time. Respondent made no answer to that letter. On February 20, 1970, Mr. Castor wrote respondent again stating, 'May we have a reply to our letter of February 10 by return mail?' Again, no response to this letter by respondent. On March 2, 1970, Mr. Castor wrote respondent renewing his request for an approximate trial date and stating:

'I would feel that you could spare five minutes to answer our inquiry.'

Respondent made no response to this letter. Again on March 12, 1970, Mr. Castor wrote to respondent, stating:

'You promised a status report on this matter on February 10. As of this date we have received no word from you. Please reply by return mail.'

"7. On March 17, 1970, respondent wrote his second letter to Mr. Castor, informing him as to the status of the Pelham matter, but making no mention of the Herrin matter. On the same date, respondent also wrote the Minnesota State Bar Association, advising the association that he had written the insurance company.

"8. On July 24, 1970, respondent wrote both Mr. Castor and Mr. Catherwood that the Pelham matter had been settled, and enclosed a check to the insurance company.

"9. On July 28, 1970, Mr. Castor wrote respondent acknowledging said settlement, and asking for a status report on the Herrin matter. In failure of a response, Mr. Castor wrote respondent on September 22, 1970, renewing his request for a status report. Respondent did not answer this letter nor communicate with Mr. Castor until the Herrin matter was finally resolved on February 17, 1971.

"10. Respondent acknowledged that he had no reasonable explanation for the extended delays in these matters. He further acknowledged that he had no reasonable explanation for his failure to respond to correspondence from the insurance company, from the Minnesota State Bar Association, and from the District Ethics Committee, 'except that he was too busy and had had rather a long period of health problems.'

## "COMPLAINT NO. X.

Re: Leonard W. Wolff

"1. On about April 12, 1972, Leonard W. Wolff, of rural Glenville, Minnesota, engaged respondent to represent him in his claim for Workmen's Compensation benefits for employment-related injuries sustained on April 23, 1970. On this initial meeting, respondent had Mr. Wolff sign several blank law-office-letterheads, plus certain other forms which are not now available. It was intended and understood that such signed letterheads would be made into and used for medical authorization forms. Also, respondent drafted an 'Employee's Claim Petition', as required to be filed with the Commission, in order to initiate a Work-

men's Compensation proceeding * * *. Respondent, without the knowledge of Mr. Wolff, signed Mr. Wolff's name upon said petition as petitioner, signed the name of his secretary, Marina E. Gari, as notary public, and then signed his own name as attorney for employee-petitioner. Said petition as so prepared was filed by respondent with the Workmen's Compensation Commission as an original without disclosing the lack of genuineness of two of the signatures thereon.

"2. On May 5, 1972, Mr. Gene P. Bradt, attorney for the employer and insurance carrier, wrote respondent asking for medical reports, particularly with respect to the claim for permanent-partial disability * * *. Respondent made no response to the request. On June 9, 1972, respondent attended a pretrial hearing before Compensation Judge Thomas W. Walsh in Mankato, where both the judge and adverse attorney David J. Odlaug, an associate of Mr. Bradt, were led to believe by respondent that Dr. M. A. Keil of Albert Lea had given a 25 percent permanent-partial disability rating of Mr. Wolff's left arm and shoulder, and that respondent would forward to Mr. Bradt a copy of Dr. Keil's report. As a result of such representations, Judge Walsh set the matter down for a one-day trial before Compensation Judge John W. Keeler in Albert Lea on August 3, 1972, to commence at 10:00 a. m.

"3. On June 29, 1972, Mr. Bradt wrote respondent that he had scheduled a re-examination of Mr. Wolff by Dr. P. H. Gislason for Friday, July 14, at 3:00 p. m., and asked him to advise his client thereof and to be present. Said letter also scheduled a deposition of Dr. Gislason for Friday, July 21, at 2:00 p. m. * * *. Respondent failed to notify Mr. Wolff as requested, and ignored the notice to take Dr. Gislason's deposition. By his follow-up letter dated July 24, 1972, Mr. Bradt informed respondent he had learned of the aborted examination and deposition, and asked respondent to please have his client make arrangements directly with Dr. Gislason's office prior to the August 3 trial so that Dr.

Gislason's testimony could be taken. Respondent completely ignored this communication and was totally unprepared to present any medical testimony at the scheduled trial on August 3, 1972.

"4. Notwithstanding that respondent knew for some substantial time before August 3 that he would be unable to proceed with Mr. Wolff's case, he neglected to notify the judge, the adverse counsel, and his client of that fact so as to save them the trouble and expense of making an unnecessary trip to Albert Lea.

"5. Mr. Wolff, pursuant to notice of trial sent him by the Commission, appeared that morning at respondent's office at approximately 9:30 a. m. He was at that time told by respondent that the trial 'had been cancelled' and that he might as well go home. Respondent then attended traffic court where he handled some matters, and then he proceeded to the Wolff trial where he arrived some 30 minutes late. Respondent represented to Judge Keeler, who had come from St. Paul specifically for the trial, that the case would have to be postponed because 'he had no medical support and that he did not know the whereabouts of his client.' Upon these representations, Judge Keeler struck the case from the calendar and made his written order dated August 14, 1972, reciting therein the above reasons. * * * Mr. Wolff, upon receiving a copy of said order and realizing he had been misled by respondent, did not again consult respondent.

"6. Following the striking of the case, Mr. Bradt asked respondent whether he had Mr. Wolff's medical reports available, to which respondent replied that he had them in his office but that he was too busy that day to get them. The fact was, respondent had no medical reports at that time, nor had he ever asked for any. Following up and on January 30, 1973, Mr. Bradt wrote respondent in part:

'As I recall the last time I saw you at the scheduled hearing at Albert Lea, you were going to get together your medical reports and forward them to me with some kind of a settlement proposal. I would appreciate it if you would do this when you get the opportunity' (Petitioner's Exhibit O).

Receiving no response of any kind for respondent, Mr. Bradt closed the Wolff file on October 23, 1973.

"7. A few days prior to the aforementioned scheduled trial on August 3, 1972, Mr. Wolff being concerned about the blank sheets upon which he had written his signature, asked respondent for copies of the medical authorization forms sent, and asked for the return of any unused forms. Respondent falsely informed Mr. Wolff that three of such forms had already been used. One blank respondent had in his file was returned to Mr. Wolff, which respondent represented to be the only unused form. At the hearing of this matter respondent admitted that he made no requests for medical reports until June 1974, and that at no time did he receive a disability rating of Mr. Wolff from Dr. Keil.

"8. Following the striking of the case, respondent did nothing until he received the follow-up letter of Judge Kurtz of May 7, 1974 * * *. Respondent, in an effort to prevent a dismissal of the matter, proceeded to obtain for the first time some medical information from Doctors Keil and Gislason. Upon a showing of some activity, Judge Kurtz by letter dated June 18, 1974 granted respondent an additional 60 days to resolve the matter with respect to medical reports supporting the claim * * *. Except for a total of five letters sent to the doctors * * * in June and August, 1974, respondent did nothing more to obtain medical evidence to support the claim. At no time subsequent to August 3, 1972 did respondent contact Mr. Wolff. Mr. Wolff terminated the attorney-client relationship with respondent on March 11, 1977 and retained Mark A. Anderson, Esq. * * *.

*"COMPLAINT NO. XI.*

Re: Sandra Larson Johnson (Family Matters)

"1. In March or April of 1968, Mrs. Sandra Johnson, then Mrs. Sandra Larson, engaged respondent to institute divorce proceedings against Gerald Larson. Without

advising her that he had in 1966 counselled Mr. Larson concerning their marriage problems, respondent agreed to commence a divorce action. The divorce trial was held during August of 1968, and respondent neglected to draft the findings of fact until October 16, 1968, and then only after being pressed by Mrs. Larson.

"2. Almost immediately following the divorce, Mrs. Larson experienced difficulties in collecting child support from Mr. Larson. In November 1968, Mrs. Larson married Keith Johnson, thereby becoming Mrs. Sandra Johnson, and a resident of Littleton, Colorado. Thereafter Mrs. Johnson corresponded with some frequency with respondent in an effort to pursue collection of her child support arrearages and payments. On July 30, 1969, respondent wrote Mrs. Johnson that 'I have commenced the procedures' to bring Mr. Larson into court by September 12, 1969. The fact was that nothing had been commenced, and the first post-divorce document was not served until October 10, 1969 * * *.

"3. That said post-divorce document was a purported affidavit of 'Sandra L. Larson subscribed and sworn to before respondent as Notary Public in Freeborn County, Minnesota, on September 25, 1969' * * *. That said affidavit was filed by respondent with the Clerk of District Court, Freeborn County, Minnesota, on October 10, 1969, in support of the motion being brought on behalf of Mrs. Johnson to hold Gerald Larson in contempt of court. That the facts are that respondent's signature thereon as Notary Public is genuine, but that the purported signature of Mrs. Johnson as Sandra L. Larson is not. It is undisputed that the first time Mrs. Johnson became aware of the existence of said affidavit was when she came to Minneapolis to attend this hearing.

"4. The aforementioned post-divorce matter was heard before the Honorable Daniel F. Foley on October 10, 1969. The hearing was then continued several times and again heard on December 11, 1969, at which time Judge Foley took the matter under advisement.

"5. The next time a matter of Mrs. Johnson's was before the district court was the Uniform Reciprocal Support Action taken on behalf of Mrs. Johnson by the Freeborn County Attorney which came on for hearing on May 14, 1971. Judge Foley continued that matter to June 11, 1971, at which time it and the contempt matter were to be heard jointly.

"6. At the conclusion of the joint hearing, Judge Foley announced an amendment of the divorce decree by lowering the child support payments, providing for payment on support arrearages, directing Mr. Larson to submit a detailed financial disclosure, and a continuance of both matters to July 19, 1971. Judge Foley stated on the record that Mrs. Johnson's attendance at the July 19, 1971 hearing was not required, and then directed respondent to draft and submit an order embodying the terms of his oral decision. Notwithstanding respondent's agreement to prepare and submit a proposed order, he failed to do so. The July 19, 1971, special term calendar reveals no hearing was held, and that the matter was continued to September 10, 1971. The calendar for the latter date reveals nothing, and it appears as though the matter just disappeared from the calendar.

"7. From Colorado, Sandra Johnson telephoned respondent in September 1971, inquiring as to the status of her child support matter. In response she was told by respondent that he had been back into court and that the matter was still under advisement by Judge Foley. The fact was that said matter was not under advisement, that respondent had made no court appearance in the matter in 1971, and that respondent had made no effort to follow through and bring the matter to a conclusion.

"8. In August of 1971, at a time he was still representing Mrs. Johnson, respondent commenced a $12,000 lawsuit in Freeborn County District Court on behalf of Gerald Larson, without advising her of his conflict of interest.

"COMPLAINT NO. XII.

Re: Sandra Larson Johnson (P. I. Case)

"1. Respondent represented Mrs. Johnson in her personal injury case from Octo-

ber 31, 1966, through December 31, 1971, at which time he was discharged. During the period of such employment, respondent did little, if any, investigating or preparing of the matter for an early resolution.

"2. Due notice of an intended deposition of Mrs. Johnson was scheduled for April 23, 1971, in respondent's office. Respondent neglected to notify Mrs. Johnson thereof, who was then residing in Colorado, and he also neglected to advise adverse counsel of his neglect in advance of the time counsel appeared to take the deposition. Said deposition was taken on June 15, 1971, after due notice and an admonition of adverse counsel by letter that the defendant would move to dismiss the case with prejudice if Mrs. Johnson failed to show up again. Mrs. Johnson was not informed about the aborted deposition or the warning to respondent.

"3. In May of 1971, respondent received an offer of settlement in the sum of $6,000, which offer was not communicated to Mrs. Johnson until the time of his discharge.

"4. As mentioned, Mrs. Johnson by letter dated December 31, 1971, discharged respondent and demanded surrender of her file to her new attorney. Respondent insisted as a prior condition that he be paid one-third of said settlement offer plus $250 costs. The new attorney for Mrs. Johnson was compelled to take court action to require respondent to surrender the file on the ground respondent's method of calculating attorney's fees (percentage of an offer) rather than upon time spent (quantum meruit) was erroneous. Some two months after said discharge, the attorney fee dispute was compromised and the file surrendered.

"COMPLAINT NO. XIII.

Re: Harold Behle

"1. Harold Behle's ten-year old son died on August 11, 1968, when the family tractor he was operating left the county road and pinned him underwater in the ditch. After consulting respondent and it appearing that there were three possible parties that might be charged with negligence, respondent accepted employment.

"2. Mr. Behle and respondent met on some 24 occasions over a six to eight year period. Aside from a couple of phone calls and attending the taking of an insurance investigator's statement from Mr. Behle, respondent did absolutely nothing to develop the case or bring it to a close.

"3. Periodically during the period of his representation of Mr. Behle, respondent simply said to him that he would get around to the matter, or that he would keep working on it.

"4. The applicable statute of limitations for a wrongful death action ran in November of 1971. Notwithstanding such fact, respondent continued to discuss the lawsuit with Mr. Behle as though it was viable long after that time. At a casual meeting of respondent and Mr. Behle at the Freeborn County fair in the Summer of 1976, respondent told him for the first time he (Mr. Behle) didn't have much of a case and that, if he wanted to, he should see another lawyer about the matter, but that it was probably not worth it.

"5. The insurance carrier for one of the three potential defendants as of June 17, 1969, set up a reserve figure of $3,500
* * *.

"COMPLAINT NO. XIV.

Re: Cecil and Doris Heskett (Dog Bite Case)

"1. In June of 1967, Cecil and Doris Heskett, husband and wife, engaged respondent to represent them and their three-year old daughter, who was bitten in the face by a dog on May 29, 1966. Except for arranging the taking of a professional photograph of the child, respondent failed to do anything further with respect to the case. Although respondent learned the name of an insurance company which might have had some coverage in the matter, he made no investigation whatsoever. From June of 1967, to December 1, 1975, when respondent became a judge, the Hesketts frequently contacted respondent, seeking to ascertain the status of the case. Respondent's customary reply was that he hadn't done any work on their case.

"No action was commenced on behalf of the Hesketts or their daughter. It appears that whatever claim Mr. and Mrs. Heskett may have had is now lost by the running of the statute of limitations.

"At no time did respondent attempt to withdraw as counsel.

"Expenses incurred by the Hesketts were nominal—not exceeding $21.

## "COMPLAINT NO. XV.

Re: Cecil and Doris Heskett (Wrongful Employment Termination)

"1. In October of 1972, Mrs. Heskett asked respondent to handle her claim for a possible wrongful termination from her employment while she was on sick leave. Except for the commencement of a lawsuit against DeSoto Creamery & Produce Company in the Summer of 1974, he did absolutely nothing by way of investigation or preparation. He even failed to advise Mrs. Heskett that he had commenced the action.

"2. The defendant's answer to the action interposed the affirmative defense that Mrs. Heskett must first avail herself of her union grievance procedures before commencing any lawsuit. By reason thereof, respondent permitted a series of continuances without the knowledge or consent of Mrs. Heskett. During this period of continuances (November 1974–March 1975), Mrs. Heskett contacted respondent several times for a status report. At no time did respondent ever inform her that he had filed a lawsuit, had received an answer, and had granted a series of continuances.

"3. While it appears that there was little merit to this lawsuit, respondent continued to represent Mrs. Heskett, did not ask to be relieved of responsibility, did not perform basic investigative and preparatory procedures, and did not advise his client of the developments or status of her lawsuit.

## "COMPLAINT NO. XVI.

Re: Cecil and Doris Heskett (Bankruptcy Matter)

"1. In mid-year 1970, Mr. and Mrs. Heskett consulted respondent concerning the advisability of bankruptcy. On August 29, 1970, respondent accepted $100 on account and had each Heskett sign a blank bankruptcy schedule form consisting of about 36 pages. About that time a discussion arose as to whether a $711.53 loan from Thorpe Loan was secured. While the loan form and note indicated no security, some doubt remained. In any event, nothing further was done by respondent with respect to proceeding with the bankruptcy, closing it out, or withdrawing.

"2. Mr. Heskett testified that sometime after the signing, he checked with respondent regarding the bankruptcy and was told things were 'coming along'. Respondent on the other hand testified that he said no such thing and that he hadn't proceeded because 'they never told me what they expected me to do.'

"3. On cross examination, Mr. Heskett acknowledged that respondent had represented him and his wife on many occasions over a period of more than 15 years and that the only fee respondent had charged was the aforementioned $100.

"4. The bankruptcy matter is still unresolved, and the Hesketts are undecided as to what they should do. Mr. Stephen R. Erickson of Albert Lea is presently their counsel.

## "COMPLAINT NO. XVII.

Re: Duane B. Jensen (Bankruptcy Matter)

"1. On about September 16, 1971, Duane B. Jensen paid respondent $300 to put him through bankruptcy. A short time later Mr. Jensen, in need of a quick $50, asked respondent for a loan back of that amount. Respondent testified that said loan was accompanied by an agreement that respondent was not to proceed with the bankruptcy until the $50 was repaid. Mr. Jensen testified that he did not honestly remember if respondent told him that the bankruptcy would be held up as claimed, but said he didn't think so. In any event, Jensen did not repay the $50, and respondent did not have Jensen sign the forms so as to proceed with the bankruptcy.

"2. In December of 1976, respondent learned that Mr. Jensen was claiming that respondent had led him to believe that the bankruptcy petition had been filed, was claiming that respondent had appeared on behalf of him at a bankruptcy hearing in Mankato, and that Mr. Jensen had lodged an ethics complaint against him (respondent) for refusing to proceed with the bankruptcy. After receiving notice of said complaint, respondent approved a letter to Mr. Robert C. Tuveson, attorney, dated December 30, 1976 (Petitioner's Exhibit TTT), which was typed on an 'Erickson and Anderson' law-office-letterhead. Said letter was prepared by respondent's former secretary, Marina E. Gari, and contained the following:

'We have talked to Judge Gillard and if Mr. Jensen were to be given a credit of $250 on the bankruptcy account, and this credit was used to offset items No. 2 and 3, which are still outstanding, there would be a $50 refund still coming to Mr. Jensen. Had Judge Gillard billed Mr. Jensen on an hourly basis on the bankruptcy matter, the bill for time alone would have far exceeded the amount that was paid. However, Judge Gillard is willing to reimburse Mr. Jensen in the amount of $100.00.'

Said letter was intended to be signed by Mark Anderson, but neither he nor his associate, Mr. Erickson, would sign it. Miss Gari thereupon, with respondent's approval, rewrote the letter for her signature * * *. At the hearing, Mr. Jensen testified that Mr. Tuveson had written him that Mr. Gillard was willing to give him back $100. He said he then went to see Miss Gari, who informed him that respondent wished to discuss the matter. On about February 22, 1977, Mr. Jensen met with respondent in his chambers in Albert Lea. Respondent inquired of Mr. Jensen as to whose idea it was to have him file a complaint. Jensen said he replied that it was his own idea. Jensen then testified that the response seemed to satisfy respondent. Respondent then proceeded to make clear to Mr. Jensen what his (respondent's) testimony would be at the hearing concerning the complaint. While discussing these matters, respondent asked Mr. Jensen how much he thought he had coming, to which he replied that he (Jensen) was willing to take the $100 offered in the letter to Mr. Tuveson. Respondent then wrote out and handed Mr. Jensen his check in said amount * * *, whereupon he left the chambers.

## "COMPLAINT NO. XVIII.

Re: Royal Baseman

"1. In the Summer of 1968, Royal Baseman, then the police officer of Thompson, Iowa, formerly the police officer of Glenville, Minnesota, retained respondent to handle an action commenced by his wife's former husband, William Dagner, of Athens, Wisconsin. In addition to the moving papers, Mr. Baseman in October 1968 delivered to respondent their respective Mexican divorce decrees, tending to establish a legal divorce by each of them from his and her respective spouse in February of 1968.

"2. In December of 1968, Mr. Baseman telephonically requested of respondent the return of all papers because he and his wife had engaged a Wisconsin lawyer to handle their problems. Mr. Baseman explained that the papers were needed to establish their Mexican divorces and their subsequent marriage to each other in Mexico. Respondent informed Mr. Baseman he would mail the papers. Not receiving the papers, Mr. Baseman telephoned respondent, who said he had mailed them. Still not receiving the papers, and not knowing whom to contact for duplicate documents, the Basemans set out by automobile for Mexico. On their way they stopped at respondent's office and were told by him that he could not find the papers. The Basemans completed the trip and returned with their duplicate decrees.

"3. Shortly after November 1, 1972, Mr. Baseman received a stale statement from respondent 'Re: Wage Assignment $2.50'. Mr. Baseman returned the statement with the notation: 'Please send me my papers I left in your trust.' Respondent re-mailed the statement to Mr. Baseman; adding the note: 'Please send me my money first' (Petitioner's Exhibit ZZZ). Mr. Baseman

promptly paid the statement, and the Mexican divorce papers which had been in respondent's custody for over four years were returned without comment or explanation.

## "AS CONCLUSIONS

from the facts so found, it is considered that:

"1. Re: *COMPLAINT NO. I.* Financial Security Life Insurance Co.

"Respondent's statement to Mr. Irwin that the $15,000 fee was necessary because 'there were a lot of people who had to be taken care of' was made by him with intent to imply that he was going to pay over to certain undesignated persons sums of money to influence the granting of a license by a public agency, in violation of DR 9–101(C).

"2. Re: *COMPLAINT NO. II.* Jerry LaFavre.

"Respondent's participation in the referral plan, knowing Mr. LaFavre was offering respondent's legal services as an inducement to his prospective customers to purchase insurance and annuities, constituted a solicitation of legal services, in violation of Rule DR 2–103(D).

"Respondent's said participation in the referral plan serving professionally both LaFavre and his prospective customer subjected respondent to a conflict of interest situation, in violation of Rules DR 5–101(A), DR 5–105(A) and (C), and DR 5–107(A).

"Respondent's said participation in the referral plan offering free legal services to prospective insurance customers of Mr. LaFavre subjected respondent to a charge that he aided LaFavre in violating M.S.A. 72A.08 and 72A.20, Subd. 1(10), prohibiting insurance rebates. Respondent's conduct violated DR 1–102(A)(3), and DR 7–102(A)(7).

"3. Re: *COMPLAINT NO. III.* Carlie Kroeger.

"Respondent persistently neglected the handling of Mr. Kroeger's lawsuit, in violation of Rule DR 6–101(A)(2) and (3).

"Respondent made repeated false representations to Mr. Kroeger with intent to conceal his neglect of legal matters entrusted to him, in violation of Rules DR 1–102(A)(4) and DR 7–102(A)(5).

"Respondent made false representations to the District Ethics Committee with respect to settlement negotiations, in violation of Rules DR 1–102(A)(4), and DR 7–102(A)(5).

"Respondent falsely stated to adverse counsel that his client was 'unavailable' for deposition when it was his (respondent's) failure to notify Mr. Kroeger that caused the aborted proceeding. Respondent's conduct was in violation of Rules DR 1–102(A)(4), and DR 7–102(A)(5).

"Respondent failed to disclose to Mr. Kroeger a potential conflict of interest existing by reason of his secretary of long standing being a half-sister of the principal defendant, Ramirez, in violation of Rule DR 5–101(A).

"4. Re: *COMPLAINT NO. IV.* Albert and Mary Trettel.

"Respondent persistently neglected the handling of the Trettels' car damage action and the medical bills collection, in violation of Rule DR 6–101(A)(2) and (3).

"Respondent made repeated factual misrepresentations to the Trettels with intent to conceal his derelictions and neglect of legal matters entrusted to him, in violation of Rules DR 1–102(A)(4) and DR 7–102(A)(5).

"Respondent made false representations to the District Ethics Committee concerning the facts of the Trettel complaint, in violation of Rules DR 1–102(A)(3), (4) and (5), and DR 7–102(A)(5).

"Respondent failed to furnish adverse counsel requested information to which he was entitled, in violation of Rule DR 7–102(A)(3).

"Respondent repeatedly failed to return telephone calls placed to him by the Trettels, and failed to respond to correspon-

dence from adverse counsel, in violation of Rule DR 6–101(A)(3).

"5. Re: *COMPLAINT NO. V.* Elmer J. Bowen.

"Respondent, without being sought out by Elmer J. Bowen, whom he knew to be the designated executor in the last will of Willie T. Bartness, deceased, interjected himself into decedent's probate proceedings, in violation of Rules DR 1–102(A)(3), (4) and (6), and DR 2–103(A).

"Thereafter, and for almost four months, respondent ignored the letters of Mr. Bowen, of the legatees of decedent, and of the District Ethics Committee chairman to relinquish the estate papers to the executor, in violation of Rule DR 1–102(A)(3) and (6).

"Respondent wilfully neglected to promptly answer correspondence from his executor, the legatees and said chairman, in violation of Rule DR 6–101(A)(3).

"Respondent informed the said chairman in writing that he would advise Mr. Bowen to pick up his file, and failed to do so for over a month, in violation of Rule DR 1–102(A)(4) and (6).

"Respondent usurped the position of attorney for the executor and, when Mr. Bowen wouldn't permit respondent to get away with it, he had the boldness to demand prepayment of his statement for services before releasing said papers, in violation of DR 1–102(A)(3) and (6).

"6. Re: *COMPLAINT NO. IX.* Austin-St. Paul Mutual Insurance Co.

"Respondent persistently neglected the handling of the two subrogation matters entrusted to him by the Austin-St. Paul Mutual Insurance Company, in violation of Rule DR 6–101(A)(3).

"Respondent, over the five-and-one-half year period he had said matters, paid little or no attention to correspondence from his client, from the Minnesota State Bar Association, or from the District Ethics Committee, in violation of Rule DR 6–101(A)(3).

"Respondent failed to furnish promised status reports to his client and to the ethics committee, and ignored correspondence from his client even after being contacted three times by said bar association and said ethics committee. Respondent's conduct was in violation of Rules DR 6–101(A)(3), and DR 1–102(A)(5) and (6).

"Respondent neglected to commence litigation for over four years after receiving said matters, in violation of Rule DR 6–101(A)(3).

"7. Re: *COMPLAINT NO. X.* Leonard W. Wolff.

"Respondent wilfully filed with the Workmen's Compensation Commission a document purporting to be a duly notarized petition of Mr. Wolff, when in fact the purported signature of Mr. Wolff as petitioner and the purported signature of Marina E. Gari as notary were admittedly written by respondent. Respondent's conduct constituted a violation of Rules DR 1–102(A)(3), (4) and (5), and DR 7–102(A)(4), (5) and (6), and a violation of M.S.A. 609.-65(2), which prohibits false certification.

"Respondent persistently neglected handling Mr. Wolff's matter, in violation of Rule DR 6–101(A)(3).

"Respondent falsely represented in court to Judge Keeler, to Judge Walsh, and to adverse counsel that Mr. Wolff had a 25 percent permanent partial disability rating from Dr. Keil, in violation of Rules DR 1–102(A)(3), (4) and (5), DR 7–102(A)(5), and DR 7–106(C)(1).

"Respondent falsely told Mr. Wolff a half-hour before the scheduled trial that the trial had been 'cancelled.' Shortly thereafter and in court, respondent falsely told Judge Walsh that he didn't know the 'whereabouts of his client.' Respondent's conduct was in each instance a violation of Rules DR 1–102(A)(3), (4) and (5), DR 7–102(A)(5), and DR 7–106(C)(1).

"Respondent ignored due requests of adverse counsel for a physical examination of Mr. Wolff and for a deposition of Dr. Gislason, in violation of Rules DR 6–101(A)(3), and DR 7–102(A)(3).

"Respondent discourteously and unprofessionally allowed the matter to come on for trial in Albert Lea, knowing days ahead he was unprepared and that he could not proceed for lack of medical support. Respondent's conduct was violative of Rules DR 6–101(A)(3), and DR 1–102(A)(6).

"8. Re: *COMPLAINT NO. XI.* Sandra Larson Johnson. (Family Matters).

"Respondent persistently neglected the handling of Mrs. Larson's (now Johnson) divorce action and subsequent child support action against her former husband, Gerald Larson, in violation of Rule DR 6–101(A)(3).

"Respondent deliberately deceived Mrs. Johnson, from time to time, as to the true status of the child support action, in violation of Rule DR 1–102(A)(4).

"Respondent wilfully and falsely notarized the purported signature of 'Sandra L. Larson,' thereafter filing it with the court in support of the contempt motion he had brought on behalf of Mrs. Johnson against Mr. Larson, thereby committing a fraud upon the court and the judge, violative of Rules DR 1–102(A)(3), (4) and (5), DR 7–102(A)(4), (5), and (6), and in violation of M.S.A. 609.65(2), which prohibits false certification.

"Respondent in accepting Mr. Gerald Larson as a client in an automobile accident case at a time he was representing Mrs. Johnson in her child support case against Mr. Larson was violative of Rules DR 5–101(A) and DR 5–105(A).

"9. Re: *COMPLAINT NO. XII.* Sandra Larson Johnson (P.I. Case).

"Respondent persistently neglected the handling of Mrs. Johnson's accident case. He failed to keep her apprised of the status thereof, he failed to inform her of her scheduled deposition, and he neglected to notify adverse counsel before appearing at the deposition that she would not be present. Respondent's conduct constituted a violation of Rules DR 6–101(A)(3), and DR 1–102(A)(6).

"Respondent on being discharged demanded an excessive fee—that is, one-third of an uncommunicated settlement offer—instead of a fee based on the reasonable value of his services, in violation of Rule DR 2–106(A) and (B).

"10. Re: *COMPLAINT NO. XIII.* Harold Behle.

"Respondent persistently neglected the handling of Mr. Behle's wrongful death matter in that he failed to investigate, to obtain evidence, and to take action before the statute of limitations had run, in violation of Rule DR 6–101(A)(3).

"Respondent was not candid in his dealings with Mr. Behle, and among other things led him to believe he had a cause of action long after the statute of limitations had run, in violation of Rule DR 1–102(A)(4).

"11. Re: *COMPLAINT NO. XIV.* Cecil and Doris Heskett (Dog Bite Case).

"Respondent persistently and for over a period of seven-and-one-half years neglected the handling of the Heskett dog bite matter. Except for arranging of a photograph of the injured child, respondent did absolutely nothing for Mr. and Mrs. Heskett and their daughter. Whatever claim Mr. and Mrs. Heskett had has now expired. Respondent's conduct was violative of Rule DR 6–101(A)(3).

"12. Re: *COMPLAINT NO. XV.* Cecil and Doris Heskett (Wrongful Employment Termination).

"Respondent persistently neglected the handling of Mrs. Heskett's alleged wrongful termination from her employment matter, and failed to keep Mrs. Heskett apprised of the status of the case, in violation of Rule DR 6–101(A)(2) and (3).

"13. Re: *COMPLAINT NO. XVI.* Cecil and Doris Heskett (Bankruptcy Matter).

"While the evidence tends to reflect an abiding tendency on the part of respondent to procrastinate, the evidence is not clear

and convincing that in this instance the allegations of Complaint No. XVI are sustained and are therefore found to be not true. Said Complaint No. XVI should be dismissed.

"14. Re: *COMPLAINT NO. XVII.* Duane B. Jensen.

"The allegations in Complaint No. XVII are not sustained by the evidence and are therefore found to be not true. Said complaint should be dismissed.

"15. Re: *COMPLAINT NO. XVIII.* Royal Baseman.

"Respondent carelessly handled important papers left with him by the Basemans, and he failed to return them for over four years after their return was requested, in violation of Rule DR 6–101(A)(3).

"Respondent falsely represented to Mr. Baseman that said papers were 'in the mail' when in fact they were not. Respondent's conduct was violative of Rule DR 1–102(A)(4)."

On September 16, 1977, the decision of this court *In the Matter of Gillard* was filed, Minn., 260 N.W.2d 562. We held in that decision that the findings and conclusions set out above were amply supported by the evidence presented to Judge Fosseen but deferred acting on a recommendation for disbarment pending a hearing before the Board on Judicial Standards concerning Gillard's "fitness to hold judicial office pur-

suant to the standards set forth in Minn. Const. art. 6, § 9, and Minn.St. 490.16, subd. 3." We specified:

"In making its findings and recommendation, it is suggested that the Board on Judicial Standards consider the transcript and exhibits of the proceedings before Judge Fosseen, and such additional evidence as may be introduced either as a result of stipulation of the parties or upon the board's own order. Judge Fosseen's findings of fact will not, however, be subject to collateral attack. * * *." 260 N.W.2d 564.

The matter came on for hearing before the Judicial Board on February 24, 1978. On May 24, 1978, the Judicial Board filed its findings of fact, conclusions of law, and recommendation that Judge Gillard be removed from office. The board dismissed, as barred by the applicable 4-year statute of limitations,[2] Complaints Nos. 5, 9, 11, 12, and 18. Its recommendation of removal is based upon the remaining seven incidents of misconduct.

We are persuaded that full, clear, and convincing evidence supports the findings and conclusions of both disciplinary bodies and that the imposition of the extreme sanctions of removal and disbarment is warranted.[3]

I.

Respondent raises a number of constitutional objections, initially challenging,

---

2. Minn.St. 490.16, subd. 3, provides: "On recommendation of the board on judicial standards, the supreme court may * * * censure or remove a judge for action or inaction occurring not more than four years prior to such action being reported to the board on judicial standards that may constitute persistent failure to perform his duties, habitual intemperance or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

3. The standard of proof in attorney disciplinary proceedings requires "full, clear and convincing evidence." 1 *State Board of Examiners v. Dodge,* 93 Minn. 160, 171, 100 N.W. 684, 689 (1904).

While not commented upon in prior judicial disciplinary decisions of this court, we now expressly adopt the same clear and convincing

evidence standard. See, *Matter of Samford,* 352 So.2d 1126 (Ala.1978); *In re Hanson,* 532 P.2d 303, 307 (Alaska 1975); *Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, 276, 110 Cal.Rptr. 201, 204, 515 P.2d 1, 8 (1972); *In re Boyd,* 308 So.2d 13, 20 (Fla.1975); *Matter of Rome,* 218 Kan. 198, 206, 542 P.2d 676 (1975); *In re Haggerty,* 257 La. 1, 31, 241 So.2d 469, 489 (1970); *In re Diener,* 268 Md. 659, 672–673, 304 A.2d 587, 595; *Matter of Field,* 281 Or. 623, 576 P.2d 348, 351 (1970); *Matter of Heurermann,* 240 N.W.2d 603, 605 (S.D.1975); *In re Johnson,* 568 P.2d 855, 866 (Wyo.1978). *Contra, In re Brown,* 512 S.W.2d 317, 320 (Tex.1974) (preponderance of the evidence sufficient); *Matter of Hardt,* 72 N.J. 160, 167–169, 369 A.2d 5, 9 (1977) (proof beyond reasonable doubt required).

on separation of powers grounds, the final judicial disciplinary authority accorded to this court by Minn.St. 490.16, subd. 3, which provides:

> "On recommendation of the board on judicial standards, the supreme court may * * * censure or remove a judge for action or inaction * * * that may constitute persistent failure to perform his duties, habitual intemperance or conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

Respondent contends that that provision, ostensibly enacted pursuant to Minn.Const. art. 6, § 9,[4] is a delegation of authority in violation of Minn.Const. art. 3, § 1,[5] the separation of powers requirement. Respondent argues that under art. 6, § 9 the power to remove is a purely legislative power which cannot be delegated, *Lee v. Delmont,* 228 Minn. 101, 112, 36 N.W.2d 530, 538 (1949), or, alternatively, if delegable, it cannot be delegated to another branch of government, *State ex rel. Thompson v. Day,* 200 Minn. 77, 273 N.W. 684 (1937).

We disagree. Thompson involved a challenge to a statute which gave the governor the power to substitute judges. The court held that the statute was not authorized by the constitutional provision that permitted the legislature to enact a statute allowing a judge of one district to discharge the duties of a judge of another and that the statute violated the separation of powers doctrine.

> "We do not regard the provisions of art. 6, § 5, as sufficient authorization to the legislature to empower the executive to step out of his constitutional sphere and to exercise authority properly belonging to the judicial branch of the govern-

ment. We think that full power under art. 6, § 5, could be exercised by the legislature without calling in the executive. If so the section should be so construed, because to construe it otherwise would be in derogation of the provisions of art. 3, § 1, which are fundamental to the preservation of a free democracy. Other means have been provided for disposal of matters arising before judges disqualified by interest or by alleged bias * * *.

> *      *      *      *      *      *

> " * * * The point before us is whether under our constitution the legislature may provide that the governor may exercise a power properly belonging to the judicial branch. We hold that art. 6, § 5, does not authorize such legislation." 200 Minn. 81, 273 N.W. 686.

Thus, Thompson only precludes legislative delegation of judicial power to the executive. It says nothing about the legality of legislative delegation of judicial power to the judiciary.

It is this type of delegation—more precisely, the legislative recognition of this court's legitimate role in the supervision of the judiciary[6]—which is involved here.

We have consistently recognized that the legislature can delegate judicial or quasi-judicial authority to the judiciary. Thus, in *Kalscheuer v. State,* 214 Minn. 441, 8 N.W.2d 624 (1943), we permitted the valuation of property for tax purposes to be delegated to the courts because of its quasi-judicial nature. Similarly, in *State v. Koochiching Realty Co.,* 146 Minn. 87, 177 N.W. 940 (1920), this court upheld a statutory

---

4. Minn.Const. art. 6, § 9, provides: "The legislature may provide by law for retirement of all judges and for the extension of the term of any judge who becomes eligible for retirement within three years after expiration of the term for which he is selected. The legislature may also provide for the retirement, removal or other discipline of any judge who is disabled, incompetent or guilty of conduct prejudicial to the administration of justice."

5. Minn.Const. art. 3, § 1, reads: "The powers of government shall be divided into three dis-

tinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution."

6. Because resolution of the issue is unnecessary for our decision, we do not address the question of the scope of our disciplinary power over the judiciary, absent statutory provision, as an aspect of the inherent and supervisory power of this court.

scheme in which a court could reduce the tax assessed on real property if it found the property to be overvalued.

"The state contends that the statute * * * is unconstitutional, as an attempt to confer on the courts authority and jurisdiction over matters of purely legislative or administrative cognizance. The contention is not sustained.

"No doubt the general subject of the assessment and equalization of taxes is administrative in character, not delegable to the courts * * *. * * * [T]he fact that they retain that character does not render the statute unconstitutional, *for there is a commingling of administrative and judicial functions * * *.* The statute must therefore be held valid." 146 Minn. 90, 177 N.W. 941. (Italics supplied.)

Of even greater significance is the case of *State v. Peterson,* 50 Minn. 239, 52 N.W. 655 (1892), in which this court upheld the constitutionality of a statute providing for the suspension and removal of county treasurers by the governor for malfeasance or nonfeasance in office. Minn.Const. art. 13, § 2, stated that the legislature could provide for the removal of inferior officers for malfeasance or nonfeasance in office. This provision has a direct counterpart in Minn.Const. 1974, art. 6, § 9, which permits the legislature to remove state judges. Pursuant to art. 13, § 2, presently found in Minn.Const. 1974, art. 8, § 5, the legislature passed a statute permitting the governor to remove county treasurers. This statute had the same constitutional basis as Minn.St. 490.15 to 490.18. The court in *Peterson* had no trouble upholding the constitutionality of that statute permitting executive removal by the governor (50 Minn. 244, 52 N.W. 655):

"The power thus conferred [by art. 13, § 2] is plenary, and confers authority upon the legislature to vest the power of removal, and the determination of the question whether cause for removal exists, in any department of the government, or in any officer or official body, it may deem expedient. There is no requirement that this power shall be conferred only on the courts."

Because of the comparability of the enabling constitutional sections, we have no difficulty in finding Minn.St. 490.16 to be a constitutional delegation of the power of removal of judicial officers to the judicial branch of government.

## II.

Respondent contends that the referee's findings of fact and conclusions of law include some thirteen violations which were not specified in the petition for disbarment or supplementary petition for disbarment; that a recommendation of disbarment based, at least in part, upon such matters constitutes a violation of respondent's due process rights set forth in *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968).

In *Ruffalo,* the United States Supreme Court reversed the court of appeals Federal disbarment of an attorney who had been indefinitely suspended from the practice of law by the Ohio Supreme Court. The court specifically disavowed review of the underlying state disbarment proceedings, and in fact the United States Supreme Court had previously denied a petition for certiorari in that action. *Ruffalo v. Mahoning County Bar Assn.,* 379 U.S. 931, 85 S.Ct. 328, 13 L.Ed.2d 342 (1964).

In *Ruffalo,* the petitioner originally faced 12 charges of misconduct, including 2 accusing him of *soliciting* FELA plaintiffs through one Orlando. At the disciplinary hearing, based upon testimony of Ruffalo and Orlando, it was learned that Orlando was actually hired to *investigate* cases, including claims against Orlando's employer, the Baltimore & Ohio Railroad. Based exclusively upon this testimony, a thirteenth charge was added on the third day of hearings—that of employing an individual to work against the interest of his regular employer. Ruffalo's counsel objected and a continuance was granted but the thirteenth charge was one of the two counts sustained by the Ohio Supreme Court in ordering indefinite suspension.

The majority opinion does not specify the precise due process requirements for disciplinary proceedings, although it does discuss inadequate notice and self-incrimination.

"In the present case petitioner had no notice that his employment of Orlando would be considered a disbarment offense until *after* both he and Orlando had testified at length on all the material facts pertaining to this phase of the case. As Judge Edwards, dissenting below, said, 'Such procedural violation of due process would never pass muster in any normal civil or criminal litigation.' 370 F.2d at 462.

"These are adversary proceedings of a quasi-criminal nature. Cf. *In re Gault,* 387 U.S. 1, 33 [87 S.Ct. 1428, 1446, 18 L.Ed.2d 527]. The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh." 390 U.S. 550, 88 S.Ct. 1226, 20 L.Ed.2d 122.

The court went on to state (390 U.S. 551, note 4, 88 S.Ct. 1226, 20 L.Ed.2d 122):

"The Ohio State Bar Association and Mahoning County Bar Association, *amici curiae* in support of the order of the Court of Appeals, argue that there was no due process violation because the State Board gave petitioner several months to respond to charge No. 13. This argument overlooks the fact that serious prejudice to petitioner may well have occurred because of the content of the original 12 specifications of misconduct. He may well have been lulled 'into a false sense of security' (*Bouie v. City of Columbia,* 378 U.S. 347, 352 [84 S.Ct. 1697, 1702, 12 L.Ed.2d 894]) that he could rebut charges Nos. 4 and 5 by proof that Orlando was his investigator rather than a solicitor of clients. In that posture he had 'no reason even to suspect' (*ibid.*) that in doing so he would be, by his own testimony, irrevocably assuring his disbarment under charges not yet made."

Subsequent cases involving notice issues in disbarment proceedings have not extended *Ruffalo.* See, e. g., *Javits v. Stevens,* 382 F.Supp. 131 (S.D.N.Y.1974); *Matter of Logan,* 70 N.J. 222, 358 A.2d 787 (1976); *In re Kunkle,* 218 N.W.2d 521 (S.D.1974); *State v. Hersh,* 73 Wis.2d 390, 243 N.W.2d 178 (1976). Moreover, the due process standards announced by this court in 1947, in *In re Application for Discipline of Eugene A. Rerat,* 224 Minn. 124, 128, 28 N.W.2d 168, 172 (1947), are fully consistent with the requirements of *Ruffalo*:

"Although the exercise of the court's disciplinary jurisdiction is not to be encumbered by the technical rules and formal requirements of either criminal or civil procedure, nevertheless, in the conduct of a disciplinary inquiry by the court, it is essential that the requirements of due process of law be observed, and to this end the charges of professional misconduct, though informal, should be sufficiently clear and specific, in the light of the circumstances of each case, to afford the respondent an opportunity to anticipate, prepare, and present his defense. It goes without saying that a proceeding which may result in depriving a person of the right of following a profession to which he has dedicated his life is a serious matter. It deprives him of his established means of livelihood. He is entitled to a fair and impartial hearing and to a reasonable opportunity to meet the charges brought against him."

Judged by these standards, we find no constitutional infirmity in the procedure here employed. Close examination of the disciplinary petitions in the instant case discloses that most of respondent's objections concern a failure to allege violations of precise disciplinary rules.

At most, only collateral findings of Complaints III (misrepresentations to adverse counsel and the ethics committee), X (signing for others), and XI (falsely notarizing) involve misconduct not generally alleged in the petitions.

## III.

■ Respondent contends that the standard of conduct proscribed by Minn.Const. art. 6, § 9, and § 490.16, subd. 3, violates due process because they are vague and overbroad.

Similar challenges have been repeatedly raised and uniformly rejected by other jurisdictions. See, *Halleck v. Berliner,* 427 F.Supp. 1225 (D.D.C.1977); *Keiser v. Bell,* 332 F.Supp. 608 (E.D.Pa.1971); *Napolitano v. Ward,* 317 F.Supp. 79 (N.D.Ill.1970); *Sarisohn v. Appellate Div. Second Dept. S. Ct. of St. of N. Y.,* 265 F.Supp. 455 (E.D.N.Y. 1967); *McComb v. Commission on Judicial Performance,* 19 Cal.3d Spec.Trib.Supp. 1, 138 Cal.Rptr. 459, 564 P.2d 1 (1977); *Nicholson v. Jud. Ret. and Removal Com'n,* 562 S.W.2d 306 (Ky.1978); *In re Foster,* 271 Md. 449, 318 A.2d 523 (1974); *In re Nowell,* 293 N.C. 235, 237 S.E.2d 246 (1977). The reasoning of the courts is that the general standard of judicial conduct incorporates the more specific rules of the Code of Professional Responsibility and Code of Judicial Conduct:

> " * * * It would be impossible to enumerate in any statute all the possible grounds and circumstances justifying the removal of a judicial officer. Guidelines may be found in the Canons of Ethics, applicable to both attorneys and judges, adopted by the American Bar Association and other bar associations, and also in the general moral and ethical standards expected of judicial officers by the community." *Sarisohn v. Appellate Div., Second Dept., S. Ct. of St. of N. Y.,* 265 F.Supp.

458. See, also, *Spruance v. Commission on Judicial Qualifications,* 13 Cal.3d 778, 119 Cal.Rptr. 841, 532 P.2d 1209 (1975). Such incorporation is specifically recognized in § 490.16, subd. 5: "The supreme court shall make rules to implement this section and provide for confidentiality of proceedings." See, also, *Matter of Anderson,* Minn., 252 N.W.2d 592 (1977), suspending a district court judge for violations of the Code of Judicial Conduct as well as statutory duties, and noting "the objective sought by the legislature of providing a plenary system of judicial discipline which is capable of dealing appropriately with all cases that might arise in any varied factual context * * *." 252 N.W.2d 595.[7]

The statutory standard is not fatally vague or overbroad. The conduct complained of has nothing to do with conscientious, but unpopular, opinions or ex post facto definitions of unethical behavior. The misconduct alleged includes persistent misrepresentations, dilatoriness, and bribery solicitation. Imposition of disciplinary sanctions for such conduct hardly threatens the legitimate scope of judicial autonomy and independence.

## IV.

In referring this matter to the Judicial Board, this court held in *Matter of Gillard, supra,* that the referee's "findings and conclusions are amply supported by the evidence," 260 N.W.2d 563, and, therefore, would not be subject to "collateral attack."[8] 260 N.W.2d 564. Accordingly, the Judicial Board's findings of fact state:

> lor ought to be removed. And the Legislature, for the most part, can only prescribe general rules and principles to be carried into execution by the court with judicial discretion and justice as cases may arise." *Ex Parte Secombe,* 60 U.S. (19 How.) 9, 14, 15 L.Ed. 565, 566 (1857).

**7.** The constitutionality of necessarily broad standards of professional conduct has long been recognized:

> "It is true that, in the statutes of Minnesota, rules are prescribed for the admission of attorneys and counsellors, and also for their removal. But it will appear, upon examination, that, in describing some of the offenses for which they may be removed, the statute has done but little, if anything, more than enact the general rules upon which the courts of common law have always acted; and have not, in any material degree, narrowed the discretion they exercised. Indeed, it is difficult, if not impossible, to enumerate and define, with legal precision, every offense for which an attorney or counsel-

**8.** The scope of the limitation against "collateral attack" was disputed at the hearing. Chairman McRae expressed the Judicial Board's correct interpretation of our prior decision: "When the Supreme Court tells this board that findings of fact made by Judge Fosseen will not be subject to collateral attack, I can only assume that they're indicating to us that we are not to reweigh the evidence and make the facts contrary to those made by Judge Fosseen and

" \* \* \* [P]ursuant to the mandate of the Minnesota Supreme Court in said decision of September 16, 1977, this Board on Judicial Standards has not made a full and independent examination of the transcripts and exhibits of the proceedings before Referee Fosseen, and introduced before this Board in its proceedings herein, to determine whether those Findings and Conclusions are supported by the evidence. This Board on Judicial Standards accepts the determination of the Minnesota Supreme Court that such Findings and Conclusions (insofar as the individual complaints are properly before this Board) are amply supported by the evidence in the record before Referee Fosseen and the Minnesota Supreme Court."

Respondent contends that the limitation upon the Judicial Board's review was a denial of due process and frustrated the implicit statutory obligation of the Judicial Board to make a *separate* review and disciplinary recommendation. Respondent cites as authority *In re Kapcia*, 389 Mich. 306, 205 N.W.2d 436 (1973); *In re Moes*, 389 Mich. 256, 205 N.W.2d 428 (1973); *Gordon v. Clinkscales*, 215 Ga. 843, 114 S.E.2d 15 (1960), and *Jenkins v. Oregon State Bar*, 241 Or. 283, 405 P.2d 525 (1965).

These cases do not clearly establish the proposition for which they are cited. *Gordon v. Clinkscales, supra* and *Jenkins v. Oregon State Bar, supra* held that sitting judges, as attorneys, were subject to the supreme court's inherent disciplinary power notwithstanding the existence of a power of impeachment constitutionally given to the legislature. Subsequently, both Georgia and Oregon adopted judicial-discipline-and-removal procedures which form the basis for all later cases. See, e. g. *In re Dunahoo*,

240 Ga. 617, 242 S.E.2d 116 (1978); *Matter of Field*, 281 Or. 623, 576 P.2d 348 (1978). As explained in *In re Moes, supra*, it was held *In re Kapcia, supra* that the imposition of discipline by the Michigan State Bar Grievance Board would not *automatically* call for discipline by the Judicial Tenure Commission without a hearing and examination of the misconduct in light of the separate standards of conduct promulgated by that commission. The proceedings and referral in the instant case are consistent in principle with the Michigan cases.[9]

More critically, proceedings before the Judicial Board and the LPRB both anticipate that review by the Supreme Court shall be both final and independent of the findings and conclusions of the Judicial Board. Because this court has already conducted a review of the evidence and has found the referee's findings to be "amply supported," little purpose would be served by successive review by a subordinate body. The only question before the Judicial Board, as its chairman correctly observed, was that given this misconduct, whether removal or discipline was warranted.

At the Judicial Board hearing, respondent offered to introduce testimony by Raymond E. Highness, corroborating respondent's explanation and defense to Complaint I (solicitation of bribery). After discussion, it was agreed that Highness, who was not present at the hearing, would be deposed and the transcript reviewed by the Judicial Board. In its findings and conclusions, the Judicial Board decided that the testimony would not be properly admissible because it constituted a "collateral attack" upon the referee's findings. Nonetheless, the Judicial Board went on to hold that the testimony, if admitted, would not alter the Judicial Board's conclusions.

on the basis of which we will make a recommendation to them.

"I didn't view our role in these proceedings to include the right to consider an appeal from Judge Fosseen's findings of fact. I felt that the Supreme Court was indicating to us that we were to take those for the purposes of our proceedings as established and to determine only whether on the basis of those facts and other relevant matters that might bear upon the issue, none of which we intended to pursue

or present, but only on the basis of those facts, whether it called for the removal of a Judge."

9. To the extent that *In re Kapcia*, 389 Mich. 306, 205 N.W.2d 436 (1973) can be read to recognize the possibility of continued judicial office notwithstanding *disbarment*, it has been expressly disapproved by this court. *Peterson v. Knutson*, 305 Minn. 53, 64, 233 N.W.2d 716, 721 (1975).

Respondent now challenges the Judicial Board's recommendation because it failed to take account of the Highness testimony. Again, because this court makes an independent review of the record the failure to admit the Highness deposition, if error, may be corrected upon review. Moreover, the Judicial Board's own findings and conclusions clearly take into account the proffered evidence in alternative findings and bases for the removal recommendation. Thus, remanding for further Judicial Board hearings is unnecessary.

Raymond Highness testified that he was a longtime friend of respondent, graduating with him from the St. Paul College of Law. Highness is a salesperson for West Publishing Company and either saw or talked with respondent a few times each year. Highness testified that in December, 1974, respondent contacted him to ask if he was acquainted with anyone experienced in insurance company licensing. Highness recalled a prior meeting with an insurance company president, Clarence Koltes, and offered to contact him on respondent's behalf. On December 30, 1974, Highness called Koltes' office in Fargo and found that the company had not been licensed to do business in Minnesota. Highness thereupon called respondent to tell him that he would not be of much help and advised respondent to "be sure you charge enough." Highness admitted having no experience in insurance licensing, had never practiced law, and mentioned no suggested fee: "I am not in the fee-setting business." They did not discuss the requirements for obtaining the license; nor was the need for accountants, auditors, or specialized legal help discussed.

The topic was not discussed until late 1977, after the LPRB disbarment recommendation, when Highness reminded respondent of the prior exchange. Telephone records received by the Judicial Board along with the Highness deposition corroborated Highness' recollected sequence of phone calls.

The Highness testimony was both "additional evidence," found to be admissible by one part of this court's opinion in *Matter of* *Gillard, supra*, and a "collateral attack" on the referee's findings, barred by the same opinion. The Judicial Board resolved its dilemma by alternative findings; the deposition and exhibits are thus properly cognizable by this court in its review of the record and recommendations.

Respondent contends that the Highness testimony corroborates his explanation, i. e., that he was unfamiliar with the requirements and costs of insurance licensing and that the quoted fee was therefore set high and ambiguous. We cannot agree. The testimony does not completely explain the conversations between respondent and FSLI officers. Highness' advice related only to respondent's own fee, which respondent had set separately from the $15,000 figure requested because "there were a lot of people who had to be taken care of." Highness testified that they never discussed the need for and cost of additional specialized personnel. His testimony collaborates respondent's acknowledged unfamiliarity with the insurance licensing process; it does not disturb the suggestion that improper payoffs were being proposed.

Finally, it should be noted that there is no new challenge to remaining complaints of misconduct, characterized in the previous opinion as "a pattern of dilatory handling of clients' affairs to their prejudice; falsely executing and notarizing affidavits; and deceiving clients as to the status of their professional retainers." *Matter of Gillard*, 260 N.W.2d 562, 563 (Minn.). The Judicial Board found that such misconduct was grounds for removal wholly aside from the misconduct alleged in Complaint I. We are satisfied that the demonstrated instances of wrongdoing clearly warrant the discipline imposed.

## V.

The final issues which will be considered here may generally be called due process challenges to the regularity of the proceedings: (1) the presence of a quorum; (2) the use of respondent's name in the title of the proceeding; and (3) the failure to refer the matter to a referee.

In general, the precise requirements of procedural due process depend upon the type and context of the proceedings, *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), and the extent to which the claimant risks "grievous loss," *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The due process guarantees of a criminal proceeding are not applicable; judicial removal is neither civil nor criminal in nature, but sui generis, designed to protect the citizenry by insuring the integrity of the judicial system. *Napolitano v. Ward*, 457 F.2d 279 (7 Cir. 1972), certiorari denied, 409 U.S. 1037, 93 S.Ct. 512, 34 L.Ed.2d 486; *Keiser v. Bell*, 332 F.Supp. 608, 617 (E.D.Pa.1971). See, generally, *McComb v. Commission on Judicial Performance*, 19 Cal.3d Spec.Trib.Supp. 1, 138 Cal.Rptr. 459, 564 P.2d 1 (1977); *Nicholson v. Judicial Retirement & Removal Comm.*, 562 S.W.2d 306 (Ky.1978). It is clear, however, that general due process rights to fair and regular proceedings do attach. See, discussion in Part II, *supra*, of *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117.

1. *Absence of a quorum.* The Judicial Board noted the existence of a quorum at the beginning of the February 24, 1978, hearing and again after one member left. On April 19, 1978, after the hearing and submission of briefs, respondent moved to disqualify two board members whose terms had lapsed, one of whom was present at the February 24 hearing. Those members voluntarily recused themselves from further participation.

The result, respondent contends, was to invalidate the February 24 Judicial Board proceedings because the departure of one member and recusal of another left only four members, short of the necessary quorum.[10]

While it is true that the terms of two members of the Judicial Board, Dillion and Murphy, may have expired on January 2, 1978, there is a specific statutory provision providing that they may serve until their successors are appointed and qualified. Minn.St. 490.15, subd. 2, provides with respect to the Judicial Board:[11]

"The membership terms, compensation, removal of members, and filling of vacancies on the board shall be as provided in section 15.0575."

Minn.St. 15.0575, subd. 2, provides in part:

" * * * Members may serve until their successors are appointed and qualified. If the appointing authority fails to appoint a successor by July 1 of the year in which a term expires, the term of the member for whom a successor has not been appointed shall extend, subject to the advice and consent of the senate if the member was appointed by the governor, until the first Monday in January four years after the scheduled end of the original term."

Since the governor had not appointed any successor to either Dillon or Murphy following the expiration of their terms and during the period of time in which they did participate in the February 24, 1978, hearing, respondent's argument of a lack of a quorum is without merit.

Moreover, even accepting respondent's argument that the proceedings were invalid under Rule A(5), Rules of the Board on Judicial Standards, it is not clear that this court is without power to hear the matter.

---

10. Rule A(5), Rules of Board on Judicial Standards, provides: "A quorum for the transaction of business by the commission shall be five members of the commission." Rule R(1) provides in part: "[T]he affirmative vote of five members of the commission who have considered the record, and at least three of whom were present when the evidence was taken, is required for a recommendation of discipline, removal, retirement, or suspension of a judge. In the absence of such votes, an order of dismissal of the complaint shall be entered by the commission." Rule H(5) provides in part: "When the hearing is before the commission, not less than five members shall be present while the hearing is in active progress."

11. See, also, Minn.St. § 10.09 which provides: "Except as otherwise provided, the terms of all officers appointed by the governor shall begin upon the date when such officers qualify and assume their official duties, shall continue for the prescribed period thereafter, and until their successors are appointed and have qualified."

*Matter of Wireman*, Ind., 367 N.E.2d 1368 (1977), the court considered several due process challenges to disciplinary proceedings against a city court judge. Despite the hearing officer's failure to conduct the hearing within 60 days, as required by the rules, the court held that technical noncompliance did not, under the circumstances of the case, so offend principles of fundamental fairness as to require dismissal. 367 N.E.2d 1370.

■ Because this court conducts an independent review of the evidence and accords the Judicial Board's disciplinary recommendations no presumptive weight, the absence of a quorum should not be fatal, particularly where there were six members of the board, not counting Dillion and Murphy, who acted unanimously on the *Gillard* matter at the meeting of April 27, 1978, and the meeting of May 19, 1978.

■ 2. *Use of respondent's name.* The Judicial Board noted respondent's objections to the use of his name in the caption of the complaint, in violation of Rule E, Rules of Board on Judicial Standards.[12] While technically in violation of Rule E 1, we recognize the unusual procedural history of this case, resulting in public disclosure of the charges against respondent in our opinion of *Matter of Gillard, supra,* prior to the initiation of Judicial Board proceedings. In the future, more scrupulous compliance with the rules is directed; under the circumstances of this case, where there was little confidentiality to protect, noncompliance does not so offend fundamental fairness as to void the proceedings.

■ 3. *Failure to refer to a referee.* The clear language of Rule G(1), Rules of Board on Judicial Standards, permits the Judicial Board to set the evidentiary hearing before itself or a referee:

"Upon the filing of an answer or upon expiration of the time for its filing, the commission shall set a time and place of

hearing before itself or before a referee and shall give notice of such hearing to the respondent at least 20 days prior to the date set."

While respondent contends that the refusal to appoint a referee, without expressing a reason, is an arbitrary and capricious denial of a statutory procedure, we find no error in the decision of the Judicial Board that the importance of the matter warranted its exclusive involvement. Further, referees are intended to permit an efficient and economical gathering of evidence for review. There was little additional evidence submitted here, however, and the Judicial Board was precluded from reexamining Referee Fosseen's findings and conclusions. Efficiency and economy clearly supported the decision to bypass additional review of an essentially legal question.

■ Finally, we note that a remaining critical question has already been decided. By our prior decision we have determined that conduct preceding appointment to the judiciary may be a basis for disciplinary action including removal.

On the basis of the foregoing opinion the orders of this court dated June 30, 1978 are confirmed and made operative as of that date.

### APPENDIX

(Pertinent sections of *Disciplinary Rules, Code of Professional Responsibility*)

*DR 1–102*:

"(A) A lawyer shall not:

    \*       \*       \*       \*       \*       \*

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

---

12. Rule E 1 provides: "After the preliminary investigation has been completed, if the commission concludes that formal proceedings should be instituted, the commission shall without delay serve a written complaint to the judge advising him of the institution of formal proceedings to inquire into the charges against him. Such proceedings shall be entitled: Before the Commission on Judicial Standards Inquiry Concerning a Judge, No. _____."

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

*DR 2–103 :*

"(A) A lawyer shall not recommend employment, as a private practitioner, of himself or anyone associated with him to a nonlawyer who has not sought his advice regarding employment of a lawyer.

\*　　\*　　\*　　\*　　\*　　\*

"(D) A lawyer shall not knowingly assist any person to promote the use of his services or those of any lawyer associated with him."

*DR 2–106 :*

"(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

"(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent."

*DR 5–101 :*

"(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

*DR 5–105 :*

"(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

\*　　\*　　\*　　\*　　\*　　\*

"(C) In the situations covered by DR 5–105(A) \* \* \*, a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

*DR 5–107 :*

"(A) Except with the consent of his client after full disclosure, a lawyer shall not:

(1) Accept compensation for his legal services from one other than his client.

(2) Accept from one other than his client any thing of value related to his representation of or his employment by his client."

*DR 6–101 :*

"(A) A lawyer shall not:

\*　　\*　　\*　　\*　　\*　　\*

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him."

*DR 7–102 :*

"(A) In his representation of a client, a lawyer shall not:

\*　　\*　　\*　　\*　　\*　　\*

(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

(4) Knowingly use perjured testimony or false evidence.

(5) Knowingly make a false statement of law or fact.

(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

*DR 7–106:*

\* \* \* \* \* \*

"(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

(1) State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence."

*DR 9–101:*

\* \* \* \* \* \*

"(C) A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official."