**In re PUBLIC HEARING ON VACAN-CIES IN JUDICIAL POSITIONS IN the FIFTH JUDICIAL DISTRICT.**

**No. C9–85–1506.**

Supreme Court of Minnesota.

Oct. 4, 1985.

## ORDER

WHEREAS, pursuant to the provisions of Minnesota Statutes § 2.722, subdivision 4 (1985) the Supreme Court is empowered to continue, abolish, or transfer judicial positions which are vacated upon the death, resignation, retirement or removal from office of incumbent judges after consultation with judges and attorneys in the affected judicial district; and

WHEREAS, after public notice, a public hearing was held on September 13, 1985 in the Brown County Courthouse, New Ulm, Minnesota, to determine whether the continuation of the judicial positions being vacated by the forthcoming retirements of Judge L.J. Irvine and Judge Walter H. Mann are necessary for effective judicial administration; and

WHEREAS, the following individuals testified at the hearing:

Dale W. Good, Information Systems Director, Office of the State Court Administrator

Honorable L.J. Irvine, Judge of District Court, Fifth Judicial District

Honorable Walter H. Mann, Judge of District Court, Fifth Judicial District

Honorable Harvey A. Holtan, Judge of District Court, Fifth Judicial District

Honorable Charles C. Johnson, Judge of County Court, Blue Earth County

Representative Henry J. Kalis, District 29B

D. Gerald Wilhelm, Martin County Attorney, 17th District Prosecutors and Fifth District County Attorneys

Richard D. Berens, 17th District Bar Association

C. Allen Dosland, Ninth District Bar Association

Calvin P. Johnson, Fifth District Public Defenders

Roger H. Hippert, Esq., New Ulm

WHEREAS, the following individuals did not testify at the public hearing, but instead submitted written materials to be considered by the Supreme Court:

Judge Noah S. Rosenbloom, Judge of District Court, Fifth Judicial District

Judge David E. Christensen, Judge of County Court, Pipestone County

Judge George Marshall, Judge of County Court, Lyon County

Representative David M. Jennings, Speaker of the House of Representatives, District 29A

Representative Terry M. Dempsey, District 23A

Senator Gary DeCramer, District 27

Paul Stoneberg, Lyon-Lincoln County Bar Association

J. Brian O'Leary, Ninth District Bar Association

Benjamin Vander Kooi, Rock County Bar Association

Tom Tourville, Marshall Area Chamber of Commerce

Robert R. Maunu, Esq., Pipestone

Leland Bush, Esq., Tyler

Patrick J. Leary, Esq., Marshall

Andrew G. Doom, State Parole and Probation Agent, Marshall

Representative Carol Dyke, District 28A

Ardis Andert, Southwest Women's Shelter, Marshall

Frank Moorse, Region VIII North Welfare Department, Marshall

Catherine M. Fletcher, Blue Earth

WHEREAS, this court has considered the arguments made, both orally and in writing, respecting the continuation of the vacant judgeships, and has attached to this order a memorandum which addresses the salient points raised in such arguments; and

WHEREAS, this court has considered the weighted caseload indicators of judgeship need in the Fifth Judicial District, described more fully in the accompanying memorandum, and finds that there exists a surplus of judicial resources in the Fifth District and in the assignment districts affected by the vacancies described above;

NOW, THEREFORE, IT IS HEREBY ORDERED that the vacancies in the judicial positions occasioned by the retirement of Judges L.J. Irvine and Walter H. Mann be, and the same are hereby terminated, effective upon the dates of retirement of the respective judges.

IT IS HEREBY FURTHER ORDERED that the judicial positions terminated in the Fifth Judicial District by the operation of this order are subject to future transfer by action of the Supreme Court pursuant to the provisions of the above statute.

MEMORANDUM

The 1985 Minnesota Legislature amended Minnesota Statutes § 2.722 by adding a subdivision which reads as follows:

Subd. 4. (DETERMINATION OF A JUDICIAL VACANCY.) When a judge of the district, county, or county municipal court dies, resigns, retires, or is removed from office, the supreme court, in consultation with judges and attorneys in the affected district, shall determine within 90 days of receiving notice of a vacancy from the governor whether the vacant office is necessary for effective judicial administration. The supreme court may continue the position, may order the position abolished, or may transfer the position to a judicial district where need for additional judges ex-

ists, designating the position as either a county, county/municipal or district court judgeship. The supreme court shall certify any vacancy to the governor, who shall fill it in the manner provided by law.

The Supreme Court recognizes and accepts the responsibility conferred upon the court, and by promulgating the accompanying order and this memorandum, intends to discharge its obligation under the law. The only issue before us is whether to continue two judicial positions which have been vacated by the retirement of the incumbent judges.

On July 22, 1985 the Governor notified the Supreme Court of the impending retirements of District Judge L.J. Irvine, effective October 31, 1985, and District Judge Walter H. Mann, effective December 31, 1985. This notification triggered the provisions of the above statute.

On September 13, 1985 a public hearing was held in the Brown County Courthouse in New Ulm, Minnesota, after public notice as specified in the accompanying order. The purpose of the hearing was to consult with the "judges and attorneys in the affected district" to assist the court in determining whether "the vacant office(s) (are) necessary for effective judicial administration." Associate Justice C. Donald Peterson, liaison justice to the Fifth Judicial District, presided at the hearing. Testimony was taken from personnel of the State Court Administrator's office and from persons identified in the accompanying order. In addition, the court received written materials in the form of letters and resolutions from interested persons presenting their views concerning the disposition of these judicial positions. The testimony was tape recorded; the tapes and all documents submitted to the court constitute the record in this matter.

WEIGHTED CASELOAD ANALYSIS AND ITS APPLICABILITY TO THE DETERMINATION OF ADEQUATE JUDICIAL RESOURCES. Since 1976, the legislature has appropriated funds for the development and implementation of the State Judicial Information System (SJIS) and its companion project, the weighted caseload analysis. SJIS, among other features, captures data regarding the number of case filings, by case type, and charts the progress of litigation through the court system until final disposition. This automated system allows for a very specific analysis of judicial workload at both the county and district court levels. The SJIS database, when coupled with the weighted caseload information, enables judicial administrators and the legislature to arrive at the number of judges required throughout the state to dispose of litigation filed in our courts.

Briefly stated, three factors comprise the weighted caseload analysis: case weights, case filings and judicial equivalent. Case weights are the average time required for a judge to dispose of each type of case. Case filings are the actual number of cases for each case type filed each year, and are derived from SJIS. The judicial equivalent is the amount of time a judge typically has available to dispose of cases. This figure is calculated by: 1) subtracting from the calendar year, weekends, holidays, and sick, vacation and educational/administrative leave; and 2) subtracting from the standard 7.5 hour work day, non-case related time spent on intradistrict travel; administration and file management; "dead" time, i.e., time spent awaiting trial; and general legal research and professional reading.

The case weights and judicial equivalent were derived from data collected during a survey conducted in 1980. During the period of August 11 to November 21, 1980 time actually spent by judges and court personnel was logged regarding specific activities each day. Ninety-eight percent of the judges participated and some 11,000 daily time reports were received and reviewed; any apparent anomalies were investigated, and the reports were corrected when necessary. The survey produced the amount of courtroom and chambers time that a judge typically requires to dispose of specific types of cases, thereby allowing for the derivation of case weights.

Additionally, the survey determined the judicial equivalent calculation by recording the amount of time per year that a judge should have available for case-related work. This calculation is particularly necessary, because demands on judges' time for such off-the-bench activities as travel and court administration vary among judicial districts. The judicial equivalent, therefore, takes into account the salient fact that judges in non-metropolitan districts typically have less time available for courtroom work than do urban judges, primarily because of "windshield" time spent traveling between courthouses. The judicial equivalent varies even among outstate districts, so it is calculated differentially in arriving at the weighted caseload figures across the state. For example, in the Fifth District, the weighted caseload analysis allocates 1.86 hours per county judge per day and 2.37 hours per district judge per day for travel and case management. This is 110 percent more non-case related time than is credited to metropolitan judges.

The third element of the weighted caseload analysis, actual case filings, is provided by SJIS, which has collected detailed caseload information on a county and a district basis since 1978.

We find that the results of the weighted caseload analysis should be accorded great weight. The sample of time data collected during the survey period is remarkable: some states have relied upon a mere 20 percent sample of judge time collected during a few weeks. We have available one of the most comprehensive and accurate samples ever taken. The rigorous and thorough collection of actual time spent by judges in conducting their judicial business during the sampling period affords a high degree of confidence in the case weights and judicial equivalent values, both of which have been coupled with case-filing data every year since 1980 to arrive at a

judge-need estimate that is specific for counties and judicial districts.

Minnesota is not alone in utilizing the weighted caseload analysis in determining judicial staffing requirements. The states of Wisconsin, Washington, California, New Jersey and Georgia utilize weighted caseload, as do the federal courts. A committee staffed by the Stanford University School of Business has concluded that weighted caseload is the best method for determining judgeship needs.[1] Finally, the National Center for State Courts, which is a recognized courts research organization, concludes in a recent study that "the best direct measure of demand is the number of weighted filings," i.e., the weighted caseload analysis.[2]

The weighted caseload analysis has been relied upon by both the legislature and the Supreme Court. In 1982, the legislature created ten new judgeships in three suburban districts and added three more last session. In 1978 and 1982, the Supreme Court utilized the SJIS data and weighted caseload information to terminate two judgeships as a consequence of judicial district redistricting pursuant to Minn.Stat. § 487.01, subdivision 6, upon the retirement of a county court judge in Kandiyohi County and the appointment of a county court judge to the district court in Lac qui Parle County. We cannot ignore the legislature's implicit validation of the worth of the weighted caseload analysis by its creation of thirteen judicial positions during the last five years, its passage of Minn. Stat. § 487.01, subd. 6 in 1977 which is still intact today, and its enactment of Minn. Stat. § 2.722, subd. 4 last session. Indeed, the latter statute is a logical extension of the former: one authorizes the termination of unnecessary judgeships upon the redistricting of a judicial district, while the other authorizes the cancellation or transfer of judicial positions upon their vacancy if the Supreme Court determines that "effective

1. "Report of the (California) Advisory Committee to Review the Weighted Caseload System," April, 1982.

2. "Assessing the Need for Judicial Resources: Guidelines for a New Process," (Williamsburg, Virginia, The National Center for State Courts, 1983, p. 51).

judicial administration" would be enhanced thereby.

The National Center for State Courts, in its publication entitled "Assessing the Need for Judicial Resources: Guidelines for a New Process," concludes that, when a valid weighted caseload analysis has been applied to a judicial district, or to judicial assignment districts within that district, the burden of proof shifts to the locality to justify the need for judicial resources that the weighted caseload would disallow: *"A trial court should bear the burden of demonstrating why additional data are needed to supplement the state's (weighted caseload) analysis. It also should have the burden of demonstrating that its data justify a decision other than that made by the state judicial leadership,* but it should have the opportunity to address those questions and to meet its burden if it can."[3] (Emphasis added) We adopt this formulation for the consideration of judicial vacancies pursuant to Minnesota Statutes § 2.722, subd. 4.

■ We now focus upon the application of the weighted caseload analysis to the Fifth Judicial District generally and to the two vacant judgeships specifically.

WEIGHTED CASELOAD ANALYSIS AS APPLIED IN THE FIFTH JUDICIAL DISTRICT. The Fifth District currently has a complement of 21 judges, 5 of whom are district judges and 16 of whom are county judges. Every year since the inception of weighted caseload, its findings have shown that there are substantially more judges in the district than are necessary to dispose of the district's workload. The 1984 analysis indicates a need for slightly more than 15 judges in the district, nearly 6 fewer than the existing complement. A closer focus reveals a need for 4.5 district judges and 10.8 county judges. Use of a liberal rounding calculation results in a weighted caseload need for 5 district judges and 11 county judges for a total of 16 judges; 5 fewer than the current number of judicial positions.

Both of the judicial positions in question are district judgeships. Judge Mann, who is chambered in Marshall, Minnesota, is the only district judge in the five-county judicial assignment district composed of Lincoln, Lyon, Redwood, Pipestone and Murray Counties. Five county court judges are chambered in this district: Judges Marshall and Harrelson in Lyon County, Judge Farnberg in Redwood County, Judge Christensen in Pipestone County and Judge Holt in Murray County. Based on the weighted caseload analysis, Lincoln County requires .3 of a judge's time, Lyon, 1.3, Redwood, .9, Pipestone, .5, and Murray, .5. The total number of judges needed in these five counties, therefore, is 3.5. A reduction of one judge would actually result in a *surplusage* of the equivalent of 1.5 judges. Consequently, the cancellation of the Mann judgeship would leave this assignment district with more judicial resources than it requires.

Population trends add further support to the weighted caseload conclusions. From 1960 to 1980 the total population of this five county assignment area declined from 82,372 to 75,952. Projections are that the assignment district will generally continue the present decline; it is estimated that by 2010 population will drop to 71,409.[4]

An analysis of Judge Irvine's assignment district yields similar results. As is the case with Judge Mann, Judge Irvine is the lone district judge, and he is chambered in Martin County. Judge Irvine's assignment district comprises the counties of Jackson, Martin and Faribault Counties, where there are three county court judges: Judge Lasley, in Jackson County; Judge Gaarenstroom, in Martin County; and Judge Schindler in Faribault County. Weighted caseload figures indicate the need for .6 judges in Jackson County, 1.2 judges in Martin

---

3. *Ibid.,* p. 6.

4. All projected population statistics which are cited in this memorandum were supplied by the Minnesota State Demographer, an agency of the State Planning Agency. Population data for the years 1960 to 1980 were compiled by Southwest State University, Marshall, Minnesota.

County and .7 judges in Faribault County, or a total of 2.5 judges in the three-county district. The result is strikingly similar to the situation described above with respect to Judge Mann's district: the termination of Judge Irvine's position would result in the availability of approximately one-half of a judge's time more than may be required.

Demographic trends in these three counties also indicate that population is decreasing. Between 1960 and 1980, the total population of this assignment district dropped from 66,172 to 58,091. Projections are that population will continue to decline to 53,963 by 2010.

The conclusion is inescapable that both of these assignment districts have substantially more judges than are needed at the present time and would continue to have surplus resources if the two vacancies were to remain unfilled.

CRITICISMS OF WEIGHTED CASE-LOAD ANALYSIS. Several persons who testified at the public hearing or who filed documents with the court criticized the weighted caseload methodology. The concerns raised essentially are two-fold: 1) current case weights have become dated as court jurisdiction and changes in law and procedure regarding several case types have occurred since 1980; and 2) there is an urban bias inherent in the weighted caseload analysis.

With respect to the first argument, we note that other jurisdictions that use the weighted caseload methodology typically have revised their case weights on a cycle no more frequent than that planned for Minnesota. Given the magnitude of the surplus of judicial positions indicated in the Fifth District, we are confident that we can safely reduce the judicial complement by two and still accommodate any change in judgeship need which might occur as a result of updating the current case weights.

Turning to the second argument, we have already noted that the weighted caseload analysis includes a variable judicial equivalent which recognizes the additional travel, case management and research time required of rural judges. We are unpersuaded that there exists a bias favoring the urban districts in the weighted caseload analysis.

ACCESS TO JUDGES UPON THE REDUCTION OF TWO DISTRICT JUDGESHIPS. Individuals who addressed the court in this matter expressed the need for adequate access to judicial resources. In both judgeships at issue, there are county court judges chambered in the counties in which the vacancies exist: in Lyon County, there are two county court judges in Marshall, where Judge Mann currently is chambered; in Martin County, there is one county court judge located in Fairmont, where Judge Irvine currently is chambered. Those county judges would continue to be chambered in the subject counties. By comparison, we note that the similarly rural, multi-county Seventh and Ninth Judicial Districts appear to operate effectively, without unusual access difficulties, with proportionately fewer judges than would be afforded to the Fifth District after termination of two positions. For these reasons, we cannot anticipate that judicial access would be in any way impaired as a consequence of discontinuing the two judgeships.

■ ELIMINATION OF DISTRICT COURT JUDGESHIPS DESPITE WEIGHTED CASELOAD INDICATIONS OF NEED. As we have noted, the weighted caseload analysis recommends the need for 4.5 district judgeships in the Fifth Judicial District. Presently, there are five district court judgeships assigned to the Fifth Judicial District. Discontinuation of the two district positions would reduce the number to three, 1.5 less than recommended by the weighted caseload analysis.

Before 1977, this argument would have been compelling. District judges were empowered to handle district court work, and county judges could not be assigned to district court. The Court Reorganization Act of 1977 altered this situation. Minn. Stat. § 484.70, subd. 3, provides that: "The

chief judge may assign any judge of any court within the judicial district to hear any matter in any court of the judicial district. When a judge of a court is assigned to another court he is vested with the powers of a judge of the court to which he is assigned."

Similarly, the 1977 amendment to Minn. Stat. § 2.724, subd. 1, authorized the chief justice to assign district and county judges between judicial districts irrespective of the types of cases they will hear: "When public convenience and necessity require it, the chief justice of the supreme court may assign any judge of any court to serve and discharge the duties of judge of any court in a judicial district not his own at such time as the chief justice may determine."

The legislative intent regarding judicial assignments is clear: there are no longer any statutory boundaries to impede the assignment of any judges, county or district, to work in either trial court. The legislature explicitly recognizes the desirability of flexibility in making judicial assignments. Efficient judicial administration requires that any type of case can be disposed of by any trial judge, without respect to title.

It has now become routine practice for the chief judge in many judicial districts to assign district court cases to county court judges, either on a case-by-case basis or by means of "blanket" assignments of county judges to district court work. Four of our judicial districts have formally eliminated the district judge-county judge distinction by consolidating the two courts into a district court, pursuant to the provisions of Minn.Stat. § 487.191. In those districts in which this judicial reorganization, or "unification," has been effected, progress in speeding case disposition and reducing backlog has not been adversely affected.

We conclude that the reduction in the number of district court judgeships below the 4.5 indicator of district court need by the weighted caseload analysis is appropriate because total judicial resources available in the district are sufficient to meet its needs.

■ CONSTITUTIONALITY OF MINNESOTA STATUTE § 2.722, SUBDIVISION 4: Three arguments have been made concerning the constitutionality of the subject statute. First, it is argued that the subject statute should be considered to be inoperative, on the grounds that it was not considered by a policy committee of the legislature during the regular session, but was instead passed only as part of an omnibus statute enacted during the special session.

This argument is not convincing. While it is true that the bill containing the provisions of the statute was not considered by the judiciary committees of the House of Representatives and the Senate, it was included in the Senate State Departments Appropriations bill, denominated as Senate File 1530, and introduced on May 9, 1985, during the regular session. Thereafter, House File 1641 was amended by the Senate to contain the subject language, was passed by the Senate on May 11, 1985, and was sent to the conference committee, where it was passed on June 21, 1985, during the special session as House File 16. It is codified as Minn.Laws 1985, Ch. 13, Sec. 58, and was signed by the Governor on June 27, 1985.

We have long held that our consideration of the regularity of the enactment of a statute is limited to the examination of the legislative journals to ascertain whether there has been compliance with constitutional requirements. *Bull v. King*, 205 Minn. 427, 286 N.W. 311, 312 (1939) and cases cited therein; *Freeman v. Goff*, 206 Minn. 49, 287 N.W. 238, 240 (1939). We find that the constitutional requirements have been met in this instance and that we are required to apply the law as the legislature has enacted it. *See, State ex rel. Bergin v. Washburn*, 224 Minn. 269, 28 N.W.2d 652, 654–655 (1947).

■ Second, the argument has been made that the statute is in direct conflict with Article VI, § 8 of the Minnesota Constitution, which provides that when there is a vacancy in the office of judge, the Governor shall appoint a qualified person to fill

the vacancy until a successor is elected and qualified. Minn.Stat. § 2.722, subd. 4 controls the determination of when a judicial trial court vacancy occurs. The operation of that statute in no way interferes with the Governor's appointment authority once a vacancy occurs. *See, State ex rel Dosland v. Holm*, 202 Minn. 500, 505, 279 N.W. 218, 220 (1938), which holds that the power to fill a vacancy does not confer the power to declare a vacancy. We are unpersuaded that this statute is constitutionally defective.

■ Finally, it is argued that the statute, which permits the Supreme Court to terminate a judicial position, constitutes an unlawful delegation of legislative authority to the judiciary. We have consistently held that the legislature may delegate judicial or quasi-judicial authority to the judiciary. In the case of *In re Gillard*, 271 N.W.2d 785 (Minn.1978), this court held that legislative delegation to the Supreme Court of the power to remove a judge for misconduct, pursuant to Minn.Stat. 490.16, subd. 3, is constitutional. See also *Kalscheuer v. State*, 214 Minn. 441, 8 N.W.2d 624 (1943) (valuation of property for tax purposes properly delegated to the courts because of its quasi-judicial nature); and *State v. Koochiching Realty Co.*, 146 Minn. 87, 177 N.W. 940 (1920) (reduction of tax assessed on property when found to be overvalued properly delegated to the judiciary, on the grounds that such action involves a commingling of administrative and judicial functions.)

Minn.Stat. § 2.722, subd. 4 recognizes the legitimate role of the Supreme Court in the orderly and effective administration of justice. As noted in *Gillard*, a statute which authorizes the removal of judges under certain circumstances, acknowledges the legitimate role of the judiciary in supervising the conduct of judges. This role is also reflected in other statutes which grant the court broad residual powers. *See* Minn.Stat. §§ 2.722, subd. 2 (Supreme Court may alter judicial district boundaries); 2.724 (chief justice may assign temporarily any judge of any court to a court

in a judicial district not his own and may assign retired justices and judges to certain courts); 480.22 (Supreme Court may designate location of chambers for judges of all courts); and 487.01, subd. 6 (Supreme Court may combine county court districts and terminate judicial positions). We conclude that, on the basis of caselaw and statutory authority, the legislature has properly delegated the authority to terminate judicial positions to the Supreme Court.

CONCLUSION. As we have stated above, our determination regarding the termination or continuation of a vacant judicial position is based upon whether, after applying the weighted caseload analysis to that position and concluding that its continuation is unnecessary, the locality can meet the burden of demonstrating that additional factors exist which are not a part of the weighted caseload analysis, and which justify the continuation of the judicial position in question. With respect to both of the judgeships at issue, we conclude that the burden has not been met.

The assertions that weighted caseload does not take into account such factors as judicial travel requirements, court administration duties and time spent in legal research are inaccurate since all are part of the judicial equivalent component of the weighted caseload analysis. The analysis considers the additional time generally spent by non-metropolitan judges in performing these activities, and contains a specific factor for the Fifth Judicial District. Concerns about access to judicial services, which must be addressed on a case-by-case basis apart from weighted caseload, are allayed in this instance by the fact that judges are now, and will continue to be, chambered in the counties in which the vacancies will occur. Moreover, weighted caseload clearly demonstrates that, even in the absence of the two judicial positions being terminated, both assignment districts will enjoy a surplus of judicial resources. Finally, to the extent that population is an indicator of judge need, we note that population in both assignment districts has been

decreasing during the period 1960 to 1980, and projections are that it will continue to do so through the year 2010.

The Supreme Court is mindful of the fact that the reduction in the judicial complement will require some adjustments in making judicial assignments as a consequence of this order. We are confident that the action we are taking with respect to the Fifth Judicial District will not be unduly burdensome to the judges, attorneys, litigants and others who need reasonable access to the courts in the affected counties. Other non-metropolitan districts are functioning well with proportionately fewer judges than those who will remain in the two assignment districts affected by our order.

The basic principle underlying the weighted caseload analysis is that judicial positions should be allocated in accordance with a rational method of demonstrated need. This guiding philosophy underlies the action taken in the order accompanying this memorandum.